737 F.2d 214
 5 Soc.Sec.Rep.Ser. 387, Medicare&Medicaid Gu 34,007
Katherine KRAEMER, on behalf of Herself and All Others
Similarly Situated, Appellants,
v.
Margaret HECKLER, Secretary of Health and Human Services, Appellee.
 No. 889, Docket 83-6335.
 United States Court of Appeals,
Second Circuit.
 Argued April 10, 1984.
Decided June 12, 1984.
 
 Olney H. Clowe, Neighborhood Legal Services, Inc., Buffalo, N.Y., for appellants.
 Barbara Lewis Spivak, Deputy Regional Atty., Dept. of Health and Human Services, New York City (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Buffalo, N.Y., Juan A. Del Real, General Counsel, Dept. of Health and Human Services, Washington, D.C., of counsel), for appellee.
 Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and POLLACK, District Judge.*
 OAKES, Circuit Judge.
 
 
 1
 This class action challenges on procedural due process grounds the federal policies and procedures relative to the termination of Medicare coverage (hospital and skilled nursing care) of Medicare Part A beneficiaries. There are four claims raised:
 
 
 2
 1. That a determination by a medical provider's utilization review committee (URC) that an admission or continued stay is not medically necessary effectively constitutes a termination of Medicare coverage which, because it is made without prior notice to the beneficiary and without according the beneficiary a pretermination opportunity to influence that determination, violates due process;
 
 
 3
 2. That such termination operates to deny the beneficiary a right to a hearing as required by statute;
 
 
 4
 3. That the fiscal intermediary's delay of some three weeks in issuing a so-called "initial determination" from which administrative appeal can be taken, when combined with the delay in providing beneficiaries' notice of appeal rights following URC terminations, operates to deny procedural due process;
 
 
 5
 4. That the three week period between an effective termination of coverage as a result of the decision by the medical provider's URC, and the "initial determination" by a fiscal intermediary from which an appeal can be taken, operates to deny statutory rights under 5 U.S.C. Sec. 555(b) (1982).
 
 
 6
 The United States District Court for the Western District of New York, John T. Curtin, Chief Judge, denied each of the claims, and granted defendant's motion for summary judgment. We reverse because we find that the appellants have stated colorable claims on the merits, involving disputed matters of fact.
 
 Structure of the Medicare Program
 
 7
 Title XVIII of the Social Security Act, popularly known as Medicare, 42 U.S.C. Secs. 1395-1395xx (1976 & Supp. IV), provides federal reimbursement for medical care for the aged and disabled. Medicare Part A, the only part of the statute involved in this case, is funded by social security taxes and provides for hospital and skilled nursing facility (SNF) insurance benefits. Generally, entitlement to Medicare coverage occurs upon eligibility for social security retirement benefits or disability benefits. In any case, coverage is not related to financial need.
 
 
 8
 Under Part A, "providers" (e.g., hospitals, SNFs, home health agencies), 42 U.S.C. Sec. 1395x(u), are paid directly for the "reasonable cost[s]" of covered services rendered to beneficiaries, 42 U.S.C. Sec. 1395f(b), with beneficiaries paying only certain deductible charges and coinsurance amounts. 42 U.S.C. Sec. 1395e. Participating providers execute an agreement with the Secretary of Health and Human Services, under which they agree not to charge beneficiaries for items or services for which Medicare pays. 42 U.S.C. Sec. 1395cc(a)(1)(A). Reimbursement to providers may be made by the Secretary, but is more commonly made by private profit-seeking organizations such as, in the instant case, Blue Cross of Western New York, Inc. Pursuant to contract, these organizations, sometimes called "fiscal intermediaries," act as the Secretary's agents. 42 U.S.C. Sec. 1395h. Claims are submitted to the fiscal intermediary by or on behalf of the patient/beneficiary receiving the services. Fiscal intermediaries are fully reimbursed for all administrative costs in connection with their Medicare functions. 42 U.S.C. Sec. 1395h(c).
 
 
 9
 Determination of the amount of benefits payable under Part A is made by the Secretary in accordance with regulations she prescribes. 42 U.S.C. Sec. 1395ff. The initial decision on coverage under Part A is made by the Secretary's fiscal intermediary and a notice of this "initial determination" is sent to the beneficiary. 42 C.F.R. Sec. 405.702 (1983). In the event of an adverse initial determination, the beneficiary has a right to reconsideration, 42 C.F.R. Sec. 405.710-.716, and, if at least $100 is involved, the beneficiary may also obtain a hearing before an administrative law judge. 42 U.S.C. Sec. 1395ff(b); 42 C.F.R. Sec. 405.720. If $1,000 or more is involved, the beneficiary is also entitled to judicial review. 42 U.S.C. Sec. 1395ff(b); 42 C.F.R. Sec. 405.730.
 
 Scope of Part A Coverage
 
 10
 Part A provides basic protection against the costs of hospital and related post-hospital services for beneficiaries by providing for government payment for certain defined basic services. Covered services include three basic categories of medical service set forth in 42 U.S.C. Sec. 1395d(a): (1) inpatient hospital services as defined in 42 U.S.C. Sec. 1395x(b); (2) post-hospital extended care services as defined in 42 U.S.C. Sec. 1395x(h), (i); and (3) home health care services which are not at issue in this action. Extended care coverage includes "services furnished to an inpatient" of an SNF, such as nursing care and other enumerated medical and non-medical services necessary to the health of the patients and generally provided by SNFs. 42 U.S.C. Sec. 1395x(h).
 
 Utilization Review Procedures
 
 11
 Participating providers are required by statute to establish utilization review plans providing for periodic review of the "medical necessity of the services ... [to promote] the most efficient use of available health facilities and services...." 42 U.S.C. Sec. 1395x(k), (l), 42 C.F.R. Sec. 405.1035, .1137. A provider's URC must consist of two or more physicians, with or without participation of other professional personnel from either inside or outside the facility. 42 U.S.C. Sec. 1395x(k)(2)-(4). The decision that it is not necessary that a patient remain at a facility is to be made by two or more physicians unless the patient's attending physician does not object to termination of the stay, in which case one physician on the URC may make the determination. 42 C.F.R. Sec. 405.1035(e)(4), .1137(e)(1). An attending physician may not be a member of a URC reviewing her or his patient's case. 42 C.F.R. Sec. 405.1035(e)(3), .1137(b)(3).
 
 
 12
 The individual's attending physician is notified and given an opportunity to present her or his views before the URC makes a final determination. There is no requirement, however, that either the patient beneficiaries or their family members or designees receive prior notice of any impending deliberations or decisions. Thus, patient beneficiaries have no statutory opportunity to participate in the URC proceedings except through their attending physicians. If the URC's final determination is that further stay is unnecessary, written notice is given to the facility, the attending physician, and the individual within two working days of the decision. 42 U.S.C. Sec. 1395x(k)(4); 42 C.F.R. Sec. 405.1035(g)(2), .1137(e)(2). The URC decision does not constitute a discharge order and does not preclude the beneficiary from remaining in the facility or seeking alternative payment. It does, however, operate effectively to terminate Medicare coverage, because 42 U.S.C. Sec. 1395f(a)(7) prohibits Medicare coverage beyond 72 hours from the date the provider receives notice of an adverse URC decision. See also 42 C.F.R. Sec. 405.162, .166; Hultzman v. Weinberger, 495 F.2d 1276, 1280 (3d Cir.1974). The apparent purpose of the three-day period is to facilitate discharge planning. See 42 C.F.R. Sec. 405.1035(i)(2), .1137(h)(4).
 
 Role of the Fiscal Intermediary
 
 13
 The Secretary administers Medicare Part A through fiscal intermediaries. 42 U.S.C. Sec. 1395h; 42 C.F.R. Sec. 421.1-.128. Manuals issued by the Secretary's Health Care Financing Administration (HCFA) contain detailed instructions for fiscal intermediaries to follow. Following the receipt of medical services by a patient/beneficiary, a claim for Medicare payment is submitted by the provider to the fiscal intermediary. The fiscal intermediary makes what the Secretary characterizes as the "initial determination" either to pay, pay in part or deny payment. 42 C.F.R. Sec. 405.704. Despite the fact that URC terminations result in the termination of Medicare Part A benefits as a result of the statute, 42 U.S.C. Sec. 1395f(a)(7), 42 C.F.R. Sec. 405.162, .166, a termination decision by a URC is nevertheless not referred to as a "determination by the Secretary within the meaning ... of the Act." 42 C.F.R. Sec. 405.706. In its Health Insurance Manual 13, section 3420-2A, however, the HCFA directs the intermediary to accept an adverse URC decision unless there is a clear deficiency in the committee's decision or the committee fails to follow the procedures prescribed in the law and regulations.
 
 
 14
 When there is a denial of coverage, there may be no recovery or recoupment from an individual who is "without fault" in accepting benefits later denied. 42 U.S.C. Sec. 1395gg. Providers may also obtain a waiver of liability for coverage of individual claims where they neither knew nor had reason to know that services rendered constituted noncovered care. 42 U.S.C. Sec. 1395pp(a). The waiver of liability provision, as it is commonly called, was passed by Congress in 1972; before then ultimate liability for medical services inevitably rested with the beneficiary. A beneficiary is not entitled to a waiver of liability, however, if he or she has received notice of an adverse URC determination. The practical effect of this, appellants urge, is to pressure many beneficiaries into a premature termination of medical care once they have received a URC notice terminating Medicare coverage.
 
 
 15
 The claim is also made by appellants that HCFA, Medicare's administrative arm, has transformed the waiver of liability provision into a mechanism whereby URCs and fiscal intermediaries are pressured to terminate Medicare coverage prematurely. In this connection we are cited to Cutbacks in the Medicare Nursing Homes Program: Denial of Benefits, Overutilization of Hospitals, Hearing Before the Subcommittee on Health and Long-Term Care of the Select Committee on Aging, House of Representatives, Comm.Pub. 189, 96th Cong., 1st Sess. (1979); Medicare After 15 Years: Has It Become a Broken Promise to the Elderly?, Report by the Select Committee on Aging, House of Representatives, Comm.Pub. 245, 96th Cong., 2d Sess. (1980); and Adler and Brown, Who Reviews the Reviewers? A Retrospective Study of Medicare Determinations, New Eng.J. of Med. 842 (April 10, 1980). HCFA exerts this pressure to terminate, it is said, through a system of rebuttable presumptions. A provider is presumed to be without fault in a given case if the provider in the past has "effectively distinguishe[d] between cases where items or services furnished by the facility are covered under Title XVIII and cases where they are excluded from coverage...." 42 C.F.R. Sec. 405.195(b)(4). SNFs are permitted an error rate of five percent (formerly ten percent) and hospitals an error rate of 2.5 percent. In other words, if an SNF provider is reversed by the fiscal intermediary in more than five percent of the cases where the SNF initially granted coverage, the provider will lose its "without fault" presumption and be forced to absorb the cost of noncovered care already provided its patient.
 
 
 16
 Apparently, the system may not work so as to result in loss of the presumption if the provider errs by denial or termination of Medicare coverage, as opposed to the granting or continuation of coverage. There is no requirement to compile statistics with respect to unfavorable URC decisions since only if the provider "has asked the intermediary for a determination" will such decisions even come to the intermediary's attention. Yet intermediaries "will" maintain all statistics necessary to compute a provider's denial rate which "must" be reevaluated by the fiscal intermediary "every three months." Beyond this, however, the physician members of each URC are required to select or develop written criteria and standards under HCFA guidelines which are numerical or statistical measures of "usually observed performance." 42 C.F.R. Sec. 405.1035(e)(6).
 
 The Individual Plaintiffs
 
 17
 Class certification was based on two individual cases. One plaintiff, age 86, was admitted to a hospital in Buffalo, New York, in April 1978, with a hip fracture. She was transferred on April 20 to a nursing home, which notified her on May 16 that Medicare would no longer pay for her care at that facility. On May 18, she was also informed by the fiscal intermediary, Blue Cross of Western New York, that effective May 17, 1978, Medicare would no longer pay for her care at that facility. She nevertheless remained at the nursing home, and on June 12 was readmitted to the hospital. One week later she returned to the nursing home to receive daily rehabilitative therapy. On July 5, 1978, she was again notified that pursuant to a decision of the nursing home's URC, her stay would no longer be covered by Medicare beginning July 6, 1978.
 
 
 18
 With the help of counsel and use of the appellate process, this patient received a ruling from an administrative law judge (ALJ) that Medicare should pay for the period May 18, 1978 through June 12, 1978. This finding was based on the fact that both her physician and physical therapist stated that physical therapy was required at least five days per week, and that due to her age and various medical problems, such treatment could only be provided in a skilled nursing facility. On October 1, 1979, the same ALJ reversed the determination that Medicare would not pay for her nursing home stay from July 6, 1978 through August 12, 1978.
 
 
 19
 The other plaintiff, after suffering a stroke which left her unable to move her left arm or leg or to take care of her personal hygiene, was taken to a hospital on June 18, 1976 and received physical therapy in the hospital from July 2 to about July 14, 1976. By notice dated July 14, the hospital notified her that its URC had made a determination that Medicare coverage of her hospital stay would cease immediately, though she was given the 72 hour grace period. Her son-in-law requested reconsideration from the URC but it reaffirmed its previous decision, and stated that Medicare coverage had been terminated as of July 17, 1976. A month later the fiscal intermediary notified the patient of its so-called "initial determination" that her Medicare benefits had terminated July 17, and advised her of her right to request a reconsideration without noting the time limits therefor.
 
 
 20
 The patient then requested reconsideration with a five-page narrative pointing out that, with her son-in-law's assistance, she had received additional physical therapy at another facility and eventually recovered to the point where she became fully ambulatory and able to care for her own needs. Thirteen months after submission of the request for reconsideration she received a partial reversal of the earlier determination by adding seven more days of Medicare coverage to her stay at the hospital. She then sought administrative review and obtained a favorable decision directing Medicare payment for the remainder of her stay at that hospital. Although the hospital's URC apparently concluded that the patient had "plateaued" and would no longer benefit from rehabilitative physical and occupational therapy, after her son-in-law agreed to prepay the cost of her care, an SNF did agree to take on her rehabilitation. This treatment was so successful that the patient was transformed from a bed-ridden invalid to an individual capable of caring for herself.
 
 Discussion
 State Action
 
 21
 The threshold question we face is whether the Supreme Court's decision in Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), prevents us from reaching the merits of this case. In Blum, the Court held that the state is not responsible for decisions by nursing homes and attending physicians in connection with the Medicaid program so as to activate the procedural requirements of the Fourteenth Amendment. The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. Secs. 1396-1396p (1976 & Supp. IV), provides federal financial assistance to states that choose to reimburse certain medical costs incurred by the poor. Like Medicare, Medicaid requires that the services be medically necessary. 42 U.S.C. Sec. 1396. To assure that this is the case, nursing homes must establish utilization review committees of physicians with duties that parallel closely the URCs at issue in our case. The URC determines whether a patient should be continued, discharged, or transferred to a level of care either more or less intensive.
 
 
 22
 In Blum, various nursing homes' URCs decided that the members of the plaintiff class did not need the care they were receiving and should be transferred to a lower level of care. Local officials were notified and they prepared to reduce or terminate Medicaid payments to the nursing home for the patients' higher level of care. Following administrative hearings, state social service officials affirmed the decision to discontinue benefits unless the patients accepted a transfer to a health related facility providing a reduced level of care.
 
 
 23
 The plaintiffs in Blum claimed that the defendants, the Commissioners of the New York Department of Social Services and the Department of Health, had not afforded the patients adequate notice either of URC decisions and the reasons supporting them, or of their right to an administrative hearing to challenge those decisions. After the district court issued a preliminary injunction against the defendants, the parties entered into a consent judgment under which patients received substantive and procedural rights in cases involving URC-initiated transfers to lower levels of care. 457 U.S. at 997, 102 S.Ct. at 2782. Accordingly, the only issue remaining before the Supreme Court involved whether there was state action and due process rights with respect to patient transfers initiated by the health-care facility and its agents, not those resulting from decisions of URCs. Thus, contrary to the assertion in the government's brief here that Blum "held that the Medicaid recipients had failed to establish that URC decisions were in fact State actions," the Court explicitly ruled only with respect to "transfers initiated by the patients' attending physicians or the nursing home administrators themselves ... which are not the product of URC recommendations." 457 U.S. at 1007 n. 17, 102 S.Ct. at 2787 n. 17. The case before us does not concern terminations originated by the patients' own doctors or by hospital directors or nursing home administrators, as in Blum, but rather involves only the determinations of utilization review committees. Blum is thus not controlling.
 
 
 24
 Although the record before us is insufficient for us to rule conclusively on this issue, it appears that there is a far stronger basis for finding state action in the decisions of URCs which evaluate entitlement to Medicare benefits than in the decisions of attending physicians and nursing home administrators. In reversing the lower court's finding of state action, the Court noted in Blum:
 
 
 25
 The court reasoned that state action was present in the discharge or transfer decisions implemented by the nursing homes because the State responded to those decisions by adjusting the patient's Medicaid benefits. Respondents, however, do not challenge the adjustment of benefits, but the discharge or transfer of patients to lower levels of care without adequate notice or hearings. That the State responds to such actions by adjusting benefits does not render it responsible for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care.
 
 
 26
 457 U.S. at 1005, 102 S.Ct. at 2786 (emphasis in original). The Court then went on to say that:
 
 
 27
 Respondents do not rest on the Court of Appeals' rationale, however. They argue that the State "affirmatively commands" the summary discharge or transfer of Medicaid patients who are thought to be inappropriately placed in their nursing facilities. Were this characterization accurate, we would have a different question before us. However, our review of the statutes and regulations identified by respondents does not support respondents' characterization of them.
 
 
 28
 Id. In so holding the Court said that the decisions to discharge or transfer patients "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." 457 U.S. at 1008, 102 S.Ct. at 2788. Addressing Justice Brennan's argument in dissent, the Court conceded that transfers to lower levels of care are not mandated by the patient's health needs, but noted that such transfers occur only after an assessment of those needs. 457 U.S. at 1008 n. 19, 102 S.Ct. at 2788 n. 19. The Court reasoned:
 
 
 29
 In other words, although "downward" transfers are made possible and encouraged for efficiency reasons, they can occur only after the decision is made that the patient does not need the care he or she is currently receiving. The State is simply not responsible for that decision, although it clearly responds to it.
 
 
 30
 Id. (emphasis in original).
 
 
 31
 There is thus an important difference between the situation described by the Court in Blum and that involved in this case. As noted above, unfavorable URC determinations operate effectively to terminate Medicare coverage, because 42 U.S.C. Sec. 1395f(a)(7) prohibits Medicare coverage beyond 72 hours from the date the provider receives notice of the adverse URC decision. Although a termination by a URC is not referred to as a "determination by the Secretary within the meaning ... of the Act," 42 C.F.R. Sec. 405.706, again as noted above, the HCFA directs the intermediary to accept an adverse URC decision unless there is a clear deficiency in the committee's decision or the committee fails to follow the procedures prescribed in the law and regulations. Health Insurance Manual 13, section 3420-2A. Thus, the intermediary cannot pay when the URC decision is adverse to the patient unless the decision is clearly deficient or the URC has failed to follow procedures. The HCFA's manual provides a nexus between the Secretary and the intermediary's "initial determination" to pay, pay in part, or deny payment under 42 C.F.R. Sec. 405.704.
 
 
 32
 Moreover, unlike the respondents in Blum, the plaintiffs here do challenge the adjustment of benefits, not simply the discharge or transfer of patients to lower levels of care or the finding that an admission or continued stay is not medically necessary. Additionally, though the record on this point is incomplete, the URC decisionmaking process itself appears to be governed largely by statute, regulation, HCFA manuals, and transmittal letters. The physician members of the committee or group must act "in accordance with guidelines established by the Secretary" to "select or develop written criteria and standards for reviewing the necessity for admissions and continued stays and conducting medical care evaluation studies." 42 C.F.R. Sec. 405.1035(e)(6)(i). Standards are defined as "professionally developed expressions of the range of acceptable variations from a norm or criterion," and norms are defined as "numerical or statistical measures of usually observed performance." Id. It also may be material to the question of state action that the costs to providers incident to the URC function are wholly reimbursed. 42 C.F.R. Sec. 405.1035(b)(3).
 
 
 33
 We find further significant distinctions between this case and Blum with respect to the effects of the waiver of liability procedures in cases where Medicare coverage is ultimately denied for services or items already received by a patient. See 42 U.S.C. Sec. 1395pp. A patient/beneficiary of Medicare is not entitled to a waiver of liability if she or he has received notice of an adverse URC determination. Thus, once a patient receives such notice it may very well be that, fearing personal liability for continued care, she or he is pressured into a premature termination of medical care. If the facts prove to be as appellant contends, the government's use of URC determinations may well provide the state action that was missing in Blum. The record needs to be developed in this regard.
 
 
 34
 Likewise, there are important factual questions with respect to the effect of waiver of liability provisions on decisionmaking by providers. Several medical providers testified before the House Subcommittee on Health and Long-Term Care that administrators, directors of nurses, and utilization review committees are pressured in decisionmaking by the fact that the hospital or nursing home may be held liable for the costs of care retroactively denied coverage. E.g., Cutbacks in the Medicare Nursing Homes Program: Denial of Benefits, Overutilization of Hospitals, at 32, 41-42, 45-52, 124-128, 134.[1] Instead of requiring a case by case analysis of due care or fault on the part of the provider as the statute envisions, HCFA apparently uses the system of rebuttable presumptions described above. To reiterate, if, "on the basis of the bills submitted" by the hospital or skilled nursing facility, the HCFA finds that the institution "effectively distinguishes between cases where items or services furnished ... are covered under Title XVIII and cases where they are excluded from coverage," then "there will be a presumption in favor of the provider that it did not have knowledge, actual or imputed," that items or services furnished a beneficiary were excluded from coverage. 42 C.F.R. Sec. 405.195(a), (b)(4), (c)(4). In such cases, the government assumes liability for noncovered services.
 
 
 35
 Appellants argue that as a result of these regulations, providers are pressured to terminate medicare coverage prematurely. The Secretary argued to the court below, however, that it was "extremely unlikely" that the waiver of liability system works to the disadvantage of patients because a provider can just as easily lose its favorable presumptive status if its URC erroneously denies or terminates medical care coverage. This matter thus entails a disputed question of fact, which should be resolved after hearing on the merits rather than on a motion for summary judgment.
 
 
 36
 Moreover, the record on this appeal contains only bits and pieces of HCFA manuals and the letters and bulletins which it regularly distributes to the 83 participating fiscal intermediaries. Evidently, these documents are not published under the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1982), and thus are not available to the general public. Because these directives serve as the basis for the administration of the Medicare program and we do not have them sufficiently before us, in the interests of judicial prudence we remand to the district court to develop a record from which the role and effects of HCFA's manuals and other directives can be evaluated by the trial and appellate courts. The hearings and report by the House Select Committee on Aging and the study reported in the New England Journal of Medicine seem to indicate that the plaintiff class may well be able to demonstrate that the Secretary's directives serve to pressure intermediaries and providers to cut back on benefits. If so, we believe that they would have established a sufficient nexus to permit a finding of governmental action in the decisions of utilization review committees.
 
 
 37
 There is, of course, no need for a remand to determine whether there is governmental action if there is no conceivable relief that could be afforded to the appellants on the merits. The government argues that since Medicare payments, unlike the payments in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), are not conditioned upon financial need, the due process rights accorded beneficiaries must be determined under the balancing test enunciated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). E.g., Himmler v. Califano, 611 F.2d 137 (6th Cir.1979). Applying Eldridge, the district court found that the procedures used in terminating Medicare Part A benefits satisfy due process.
 
 
 38
 Given that the benefits at issue here are not based on financial need, we agree with the district court that the plaintiff's due process rights must be evaluated under the Eldridge balancing test. This test requires us to weigh the private interest affected by the official action, the risk of erroneous deprivation through the procedures used, and the probable value of additional or substitute procedural safeguards, as well as the fiscal and administrative burdens that additional or substitute procedural requirements would entail. Eldridge, 424 U.S. at 335, 96 S.Ct. at 903.
 
 
 39
 In applying the balancing test, the private interest at stake should be weighed more heavily than in Eldridge because of the astronomical nature of medical costs. The Court in Eldridge noted that "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process." 424 U.S. at 341, 96 S.Ct. at 906. In this case, the costs that accrue in the period between an unfavorable URC decision and an "initial determination" by the Secretary--which appellants argue is approximately three weeks--can financially cripple all but the very wealthy. In addition, the requirement imposed on one of the individual plaintiffs in this case that, following an adverse URC decision, she prepay her medical costs further diminishes the probability that a patient could choose to continue receiving medical care.
 
 
 40
 Also, there appear to be significant differences between Eldridge and this case with respect to the fairness and reliability of the existing pretermination procedures and the probable value of additional procedural safeguards. 424 U.S. at 343, 96 S.Ct. at 907. It is true that termination in both cases turns (or is said to turn) for the most part upon routine and (hopefully) unbiased medical reports by physicians. See id. at 344, 96 S.Ct. at 907. However, as our earlier discussion of the government nexus indicated, there are serious factual questions about the effects of governmental regulations and directives on the medical judgments of URCs. If the appellants' allegations on these matters are borne out, then we think the case would be sufficiently different from Eldridge to require different, additional safeguards.
 
 
 41
 In addition, the relief sought in Mathews v. Eldridge, as well as the procedures which the Secretary had already provided, differ significantly from those at issue here. In Eldridge, plaintiffs sought an evidentiary hearing or the right to make an oral presentation. The terminated disability recipient was already given the opportunity to make written submissions, and to receive assistance from the treating physician in so doing. The disability recipient's representative also had access to all information relied upon by the agency, and prior to the cutoff of benefits, the recipient was provided with the tentative assessment, the reasons therefor and a summary of the evidence that the agency considered most relevant. The recipient then had the opportunity to submit additional evidence or arguments to challenge directly the agency's information and tentative conclusions. Id. at 345-46, 96 S.Ct. at 907-08.
 
 
 42
 Here, in sharp contrast, prior to the URC decision none of the foregoing is given other than the treating physician's opportunity to consult with the URC. Neither the patient nor her or his family are notified, much less given the opportunity to submit evidence or arguments. Indeed, from the notices in the record in this case, the recipients are not even given the reasons for the termination as required by the regulations. 42 C.F.R. Sec. 405.704. Nor as a factual matter do we know whether treating physicians regularly appear at URC meetings to advocate their patients' causes or whether, as appellants suggest, there are built-in incentives for them not to do so.
 
 
 43
 In the light of these differences between Eldridge and the instant case, we think that the plaintiff class has stated a colorable claim on the merits to a denial of procedural due process. We fully appreciate that Eldridge throws onto the scale consideration of the additional administrative and financial burdens entailed by procedures such as pretermination notification, the opportunity for written or oral submissions and provision for a tentative assessment accompanied by reasons therefor. We leave these matters for further development in the record, simply noting that the plaintiff class has stated a colorable claim on the merits, for which summary judgment is inappropriate.
 
 
 44
 The judgment is vacated, and the case remanded for further proceedings consistent with this opinion.
 
 
 45
 POLLACK, District Judge (dissenting).
 
 
 46
 I would affirm the decision of the District Court.
 
 
 47
 Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), precludes any possible conclusion on a remand of these cases that a finding of a professional panel, including two institutional physicians, that inpatient care is not (or is no longer) "medically necessary" constitutes "state action."
 
 
 48
 Pursuant to 42 U.S.C. Sec. 1395f(a)(3), an individual qualifies for benefits for inpatient hospital services or extended care services in a skilled nursing facility under the Medicare program only when there is a determination that such services are medically required and are necessary. Pursuant to the provisions of 42 U.S.C. Sec. 1395x(k), the determination of medical necessity is made by a "Utilization Review Committee" (URC), which consists of health professionals, including two physicians. That statute requires each participating hospital or skilled nursing facility to have a URC. The URC evaluates each patient to determine whether his or her physical condition warrants hospital or skilled nursing in-facility services, basing its judgment upon medically acceptable criteria analyzed and established by autonomous hospital or nursing home staff physician members of the URC. 42 C.F.R. Secs. 405.1035(e)(6)(i), 405.1137(d)(2).
 
 
 49
 The URC must also periodically review the condition of the facility's inpatients to determine whether continued stay is "medically necessary." The medical assessment is a professionally developed expression of the range of acceptable variations from usually observed performance. A hospital URC must review each patient's diagnosis, the patient's hospitalization stay, and the justification for continuing a patient beyond an expected stay period determined by experience. 42 C.F.R. Sec. 405.1035(e)(6)(i). A skilled nursing home URC must similarly review the justification for continuing a patient beyond an expected stay period established by the URC itself. 42 C.F.R. Sec. 1137(d)(i).
 
 
 50
 If the URC has reason to find that continued stay is not "medically necessary," the patient's attending physician is notified and given an opportunity to present his or her views before the URC makes a final determination. 42 C.F.R. Secs. 405.1035(g)(2), 405.1137(e)(2). If the final determination is that further stay is medically unnecessary, written notice is given to the facility, the attending physician and the patient within two working days. 42 C.F.R. Secs. 405.1035(g), 405.1137(e). The URC decision does not constitute a discharge order and does not preclude the beneficiary from remaining in the facility or seeking alternative payment sources or accepting other care that is "medically necessary." Moreover, the decision of the provider's URC does not constitute a determination of the Secretary as to Medicare coverage. It is considered by the fiscal intermediary along with other evidence in making an initial coverage determination. 42 C.F.R. Sec. 405.706.
 
 
 51
 In Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Supreme Court held that the adjustment of Medicare Part A benefits to reflect the decision of a medical facility to discharge a patient, or to transfer him or her to a lower level of care, does not constitute "state action." The Court reasoned that such a determination is a private one, based on the professional medical judgment of private physicians and made in accordance with professional standards not dictated by the state. Id. at 1006-08, 102 S.Ct. at 2786-87. Regulations excluding from participation in the Medicare program a facility which furnishes medical care "substantially in excess of a beneficiary's needs" do not transform the URC determination into "state action;" the "regulations themselves do not dictate the decision to discharge or transfer in a particular case." Id. at 1010, 102 S.Ct. at 2788. In sum, the Supreme Court found no "state action" in "the judgment, made by concededly private parties, that [a patient] is receiving expensive care that he does not need." Id. at 1009 n. 19, 102 S.Ct. at 2788 n. 19.
 
 
 52
 In the instant case, a URC determination that the level of care received by a Medicare Part A beneficiary is no longer "medically necessary" cannot possibly be held to constitute "state action," even though that patient's benefits might later be adjusted as a result. Such a determination, like the decision considered in Blum, rests on the professional medical judgment of private physicians. 42 C.F.R. Secs. 405.1035(e)(4), 405.1137(b)(1). It is made in accordance with professional criteria established, not by the government, but by staff physicians themselves. 42 C.F.R. Secs. 405.1035(g)(2), 405.1137(e)(2).
 
 
 53
 Although the URC determination must comport with a number of regulations, these regulations--like those analyzed in Blum--do not dictate a medical necessity determination in any particular case. Despite the appellants' imaginative suggestion that these regulations somehow psychologically bias or corrupt the URC decision-making process, there is no factual basis shown in the record before this Court which indicates that a URC determination is based on anything other than the professional opinions of the staff physician members of the URC. The mere fact that waiver of liability procedures adopted pursuant to 42 U.S.C. Sec. 1395pp encourage a URC to make medically accurate determinations, for example, does not demonstrate that that URC makes medical necessity determinations adverse to beneficiaries which, absent the procedures, would be favorable to beneficiaries.
 
 
 54
 In sum, an adverse URC determination is a judgment, made by private professional parties, that a patient is receiving expensive care which he or she does not medically need. Under Blum, such a determination cannot possibly constitute "state action."
 
 
 55
 The argument which deprecates the patient's treating physician as a possibly inadequate or inattentive advocate for his or her patient before a URC, thereby requiring input from laity, is unsupportable--it goes too far. It may properly be assumed that the treating physician will not abdicate or neglect the proper care of his or her patient.
 
 
 56
 The Medicare Act calls for a medical judgment, not an uninformed, sympathy-inspired, self-serving lay response from the patient, an interested family member, or other representative of the patient's choice. Hobbling the resolution of a purely medical question by shackling consideration thereof to notice of impending URC deliberations and hearings of laypersons on the medical subject with attendant delays, confusion and controversy is not provided for by the Act or mandated either by the Constitution or sound reason. Patients and families of patients would be neither qualified nor appropriate participants in URC decision-making processes. The opportunity that the treating physician has to present his or her professional opinion to the two physicians on the URC conserves every legitimate expectation of the patient and requirement of the Medicare Act.
 
 
 57
 To impose classical due process requirements on the expression of professional medical determinations, moreover, would be akin to establishing government control of medicine. Blum happily teaches that doctors, and not laypersons, must evaluate the medical needs of patients and that doctors' opinions are not state determinations saddled with procedural due process standards.
 
 
 58
 I respectfully dissent and would affirm the judgment below.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 For example:
 MR. CHUNYK. Utilization review used to be responsible for approving lengths of stay and improving continuing services. But now, they are nothing more than a rubberstamp for what the facility director of nursing services and her committee ascertain is what should be covered and what shouldn't be covered.
 MR. BONKER. Or length of stay?
 MR. CHUNYK. Yes.
 MR. BONKER. So the doctor is signing off because he doesn't have time and doesn't get involved that much?
 MR. CHUNYK. They still get involved and go over what the in-house committee has done.
 MR. BONKER. You are saying that the proprietor or their designee actually makes the decision?
 MR. CHUNYK. That is correct, but they have only a 5-percent error factor. That is what the waiver of liability refers to; if you approve a patient for 100 days, and that is sent down for billing, and they send back and they request information on that patient's stay, you send the nursing notes and all the other information down, and then the nurse in Omaha says: "You should have only had that patient on medicare for 60 days; at this point in time the benefits should have stopped."
 So they penalize you those 40 days. If those 40 days make up more than 5 percent of your total medicare patient days for a period of time, then you lose your waiver of liability, and at that point you have got to get permission from them to do anything--admit, discharge, whatever.
 Id. at 41-42.