Joseph DAVID, as administrator of the Estate of Irene David, and on behalf of all others similarly situated, and Salvatore Civello, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Margaret HECKLER, in her capacity as Secretary, Department of Health and Human Services, and Group Health Incorporated, Defendants.

Civ. A. No. 79 C 2813.

United States District Court,
E.D. New York.

July 11, 1984.

Legal Services For The Elderly by Toby Golick, Julia Spring and Brown & Seymour by Whitney North Seymour, Jr., New York City, for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Reuben S. Koolyk, Jennifer Eng, Brooklyn, N.Y., for defendants.

Strauss & Wolf, by Robert M. Freedman, New York City, amicus curiae, for The Gray Panthers.

MEMORANDUM and ORDER

WEINSTEIN, Chief Judge:

This case began in Queens Small Claims Court where Joseph David filed suit for underpayment of Medicare reimbursement claims of his cancer-ridden wife. The United States removed the case to this court where Mr. David graphically explained that the grounds for his complaint were "the arbitrary mutilation of normal charges by considerate physicians." The case has since expanded into a class action on behalf of hundreds of thousands of older people in Queens, New York whose Medicare Part B claims have been subjected to diminution and who allege that the notice and appeal procedures available to them violate due process.

In 1982, the court certified a class consisting of persons whose disputed medical claims of $100 or more are serviced by Group Health Incorporated (GHI) pursuant to a contract with the Secretary of Health and Human Services. Millions of like claims are filed each year by the tens of millions of people in the nation who participate in the Medicare program.

A trial was held in November 1983 focusing on the issue of adequacy of the review determination notices sent to Part B beneficiaries. The record was supplemented by further material and briefs in June 1984. The evidence demonstrated that the notices do not meet due process standards. They must be changed to provide claimants with comprehensible explanations of the actual reason full reimbursement is denied. In addition the trial revealed the persistence of error in the claims reimbursement process resulting in part from a dearth of information available to beneficiaries and those acting on their behalf.

## I. *Statutory Framework*

The Medicare program—the health insurance program for the elderly and disabled—was established in 1965 under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395c *et seq.* Part A of the Act, 42 U.S.C. §§ 1395 *et seq.*, not directly in issue in this case, covers hospital and related post-hospital services and is funded out of Social Security taxes. 42 U.S.C. §§ 1395d, 1395i.

Part B is a voluntary supplemental insurance program covering most other health care costs. Enrolled individuals pay monthly premiums which together with government appropriations fund the program. In 1972, because some eligible elderly had been failing to enrole "due ... to inattention, or [inability] to manag[e] their own affairs," H.Rep. No. 231, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 5058, Congress amended the Medicare Act to provide that anyone who became eligible for Part B coverage would be enrolled automatically. 42 U.S.C. § 1395p(f). The Secretary of Health and Human Services is authorized by the Act to contract with private insurance carriers to administer the Part B claims process. 42 U.S.C. § 1395u. The carrier administering the program for the Secretary in the area covered by this suit is GHI.

Enrolled individuals are entitled to reimbursement of 80 percent of the reasonable and necessary charges for covered services after a yearly deductible of $75 has been met. 42 U.S.C. §§ 1395*l*, 1395x(v)(1)(A). Claims are submitted to the carrier which determines whether the claim is covered and how much reimbursement is due. The carrier then sends the claimant a notice known as the "Explanation of Medicare Benefits" (EOMB) form, together with the allowed payment, if any. 42 C.F.R. § 405.803. The claimant may then request a review of the decision. Review is by a different employee of the carrier than the one who performed the initial determination. 42 C.F.R. §§ 405.807, 405.810. After review the carrier is required to send the beneficiary a notice which is supposed to provide notification of the basis of the review determination. 42 C.F.R. § 405.811. Whenever the amount remaining in controversy is $100 or more the provider is required to provide an opportunity for, and establish procedures for, a "fair hearing." 42 U.S.C. § 1395u(b)(3)(C).

Hearings are held before hearing officers who are employees of the carrier. The hearing officer's decision is final. *See* 42 U.S.C. § 1395ff; *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982).

## II. *Facts*

A beneficiary can be denied partial or full reimbursement for payments made for medical treatment essentially for two reasons: if the treatment was not necessary or not covered or if the doctor's charge was not "reasonable." To assess the accuracy of the decision made on a claim, a beneficiary needs to be able to determine (1) whether the carrier properly classified the medical services provided and (2) whether the carrier correctly computed the reasonable charge allowance for that medical service. Under the present system most beneficiaries cannot make either of these determinations. The notices from the carrier are unintelligible to the average beneficiary. The information needed to decide whether the reasonable charge figure is correct is unavailable or inaccessible.

Adequacy of the initial notice to the beneficiary (the EOMB form) is before the federal district court for the District of Columbia in a nationwide class action. *See Gray Panthers v. Schweiker*, 716 F.2d 23 (D.C.Cir.1983) (*Gray Panthers II*); *Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C. Cir.1981) (*Gray Panthers I*). For that reason the initial notice has not been considered in this case. The major thrust of the trial in this case was directed to the issue of the adequacy of the review determination letter—the letter a beneficiary receives after the carrier has undertaken a review of the beneficiary's request.

The total amount of money involved in the millions of claims that are processed in the country as a whole is substantial. In fiscal year 1983 payment was reduced on over 72 million unassigned claims (those payable to the beneficiary as opposed to those payable to the doctor) on reasonable charge grounds. The aggregate amount of all reductions was close to 2.5 billion dollars. Pl.Ex. 80A. For the individual claimants—many of whom live at close to the subsistence level—the losses may impose severe hardship. In 83.9% of all Medicare Part B unassigned claims the amount the carrier determines the reasonable charge to be is less than the doctor's actual charge because of the reasonableness calculation. The national average dollar amount of the reduction is $28.48.

For claims processed by GHI, 83% were reduced with an average reduction of $34. Pl.Exs. 62A, 72A, and 80A. In one three month period alone GHI reduced the "reasonable charges" by over 11 million dollars. The amounts cut from claims represent 23.1% of covered charges. When combined with the coinsurance (claimants are only reimbursed up to 80%) this means that on the average beneficiaries are reimbursed by GHI for only about 60% of their actual medical costs. Pl.Ex. 80A.

When a claim is received by the carrier a clerk classifies the medical services provided to the beneficiary based on a computer operator's review of a short form filled out by the physician's office which contains a blank space headed "services provided." If the entry clerk fails to assign the correct code to the medical services, either because the doctor did not provide enough information, because the doctor's notation was too cryptic or because the GHI clerk was careless, it is hard for the beneficiary to know what went wrong or even to know if the reimbursement is incorrect because neither the EOMB nor the review determination letter sets forth in ordinary terms the precise nature of the medical services on which the carrier based its determination. Moreover, while the name of the doctor or other provider is stated, the exact dates of the services provided may or may not be indicated; services provided on different dates may be grouped together with only the first and last dates indicated.

The notice plaintiff Joseph David received after he requested review of the allowance on claims he submitted on behalf of his wife illustrates the problems with the review letter received by members of the plaintiff class. It is long and confus-

ing, but the full explanation of the denial of additional payment reads as follows:

> Our Medicare Department has reviewed these claims and have [sic] determined that no additional allowances are warranted. They were paid correctly to the doctors' new and old profiles.

There is no indication of what the doctor's reasonable charge allowance was even though one of the charges was for 719 dollars for which only 472 was allowed. "Doctors' new and old profiles" is not defined. Plaintiffs' uncontroverted expert on readability of prose documents, Dr. Edward Fry, testified that the letter received by Mr. David is understandable by someone at the 16th grade level or above in reading capacity—approximately the reading ability of a college senior. An employee of the carrier who testified for the government admitted that the letter sent to Mr. David was "terrible." The evidence established that this letter is not unique.

The reading expert identified other review letters received by plaintiff class members as being written at the 12th and 14th grade levels. Dr. Fry's formula, the government argues, exaggerates the reading difficulty of the letters since it takes into account numerals and proper names, both of which are used somewhat extensively. The long strings of numbers used in the letters inevitably do contribute to the difficulty many have in reading them. As Dr. Fry pointed out, by putting the numbers in tabular form, much of the difficulty would be alleviated. Moreover, even were we to ignore the numbers and proper names, the reading level of the letters Dr. Fry examined would still be above that acquired by most of the elderly population of New York. About 48 percent of the elderly in New York City (age 65 and older) have an eighth grade education or less. Evidence established that although the primary indicator of reading ability is years in school, it is sound to assume a decline of two to three years for adults in reading skill from the reported years of school.

The review letters defy understanding by the general populace. They are filled with confusing cross-references to "control numbers" and are composed of paragraphs that seem strung together randomly. Explanations are couched in technical jargon. The words and phrases "approved charges," "customary charges," "prevailing charges," "locality," "economic index," and "physicians' old and new profile," which are the substance of the letter, are specialized Medicare vocabulary. To a layman unfamiliar with Medicare regulations, this language has no real meaning. For example, "approved charge" is the term used in Part B notices for "reasonable charges." It does not connote—as the common sense meaning of the term implies—the amount actually approved for payment. A review determination letter which says a claim was "reviewed by the Medicare Department" means a clerical employee reviewed the claim, while a letter stating that the claim was "reviewed by the Medical Department" means a doctor has reviewed it. The distinction is indicated by the use of the word "Medical" rather than "Medicare." No other explanation of the difference is given. The difference may be important for if a review was by a doctor it is an indication that a close call on a medical issue was involved—something a claimant would want to know in deciding whether to request further review. An elderly person with less than eighth grade reading ability is left with no understanding of the facial sense of the letter, let alone the actual reasons why a claim was not reimbursed to the 80% level.

Review letters are not only incomprehensible, but the information they do contain is insufficient and misleading. They set forth the figure which the carrier says is controlling without making any pretense of showing how the carrier arrived at the figure. The notices explain the computation of the carrier's payment to the beneficiary only in generalized terms, assuming the correctness of the reasonable charge. This despite the fact that the key ingredients in the total computation are the reasonable charge figure and the method by which it is determined.

Other paragraphs give generalized descriptions of the procedure allegedly used to determine "approved charges" but do not offer any actual computations or other back-up material. The trial evidence showed that these descriptions often conceal the facts about how computations of approved charges are made, using interpolations, incomplete data, human and computer error, subjective decisions and sometimes pure guesswork—facts which, if disclosed, would alert anyone that more questions need to be answered before any appellate rights are waived.

Different decisions plaintiff Joseph David received at the various review and hearing stages illustrate the many options available to a carrier in calculating the reasonable charge for computing reimbursement. Part of the David claim was for reimbursement for anesthesia services for which he had paid the anesthesiologist $320. At the original processing level the reasonable charge was calculated on the basis of 20% of the surgical allowance plus $5. The allowed amount was $208. At the review level, the reasonable charge was calculated to include an additional amount on the basis of a "relative value unit" and a "one-and-one-half surgery" rule. The allowed amount became $225.88. At the hearing stage the reasonable charge was recalculated on the basis of a listed "basic unit value" and "time units." This final amount was $265.60. See Pl.Ex. 9, pp. 16, 19–20. These differing approaches to one of the critical elements in the benefit reimbursement formula underscore the need for a meaningful and effective notice and appeal procedure.

Lack of information is an ongoing problem in the Medicare Part B process; it is not limited to the problem of notice. When a hearing file is assembled for the beneficiary or his or her representative, the final approved ("reasonable") charge is supplied. Sometimes a printout of the doctor's customary charge calculations is included, but rarely is there an array of locality prevailing charge computations. Under present policy the only way a beneficiary can find out the customary charge by a particular doctor for a particular procedure is through the Freedom of Information Act. The file usually does not indicate when a "gapfiller" or other makeshift procedure was used in arriving at the approved fees, nor does it indicate the underlying calculations used in arriving at the reasonable charge.

The trial proof concerning a conversion factor used by GHI to pay plaintiff Salvatore Civello's claim—along with hundreds of others—illustrates the arbitrary and improper decisions which can underlie a carrier's "reasonable charge" computations. The carrier claimed that the conversion factor used to calculate Civello's reimbursement was based on a 1973 base year calculation, increased by the Medicare Economic Index. Pl.Ex. 15, p. 4. The nature of the base figure ($10.00) makes the number itself suspect, and the method of calculation by using the index is and was explicitly prohibited by HCFA Medicare Carrier's Manual § 5022.1B. Reasonable charge procedures prescribed in the Manual require that dollar conversion factors be recalculated each year based on prevailing charge data. Medicare Carrier's Manual § 5022.1. GHI disregarded this requirement and simply issued an internal staff memorandum stating what the conversion factor was to be. Pl.Ex. 1B.

In 1974 the Regional Office of HCFA discovered that GHI was not using a conversion factor based on community prevailing charges, as required by regulations, but rather one of the carrier's own invention. The regional office staff recommended that GHI properly develop conversion factors during the 1974 annual review, but the carrier did nothing about it. Nonetheless HCFA continued to give the carrier satisfactory ratings for six years until the 1980 review, when the annual review downgraded the rating because of "GHI's failure to properly use conversion factors."

This incorrect GHI conversion factor was necessarily used by the carrier on every Medicare Part B claim for surgery reimbursement where a "gap filler" was em-

ployed to calculate the reasonable charge, presumably resulting in improper payments to many beneficiaries throughout the period. The conversion figure was cut out of whole cloth in a manner highly improper under existing regulations, yet beneficiaries had no way of knowing they had been cheated.

Coding and reasonable charge computation are the key elements in accuracy of carrier reimbursement. They are beyond the reach of review for most beneficiaries precisely because they are not adequately set forth in the notices now in use and because the information necessary to alert others to the problems is not readily available in the hearing files or hearing process.

### III. *Jurisdiction*

■ As the basis of jurisdiction, plaintiffs rely upon section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), and the mandamus statute, 28 U.S.C. § 1361. Section 205(g) provides:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision.

This provision for judicial review is made applicable to Medicare claims by 42 U.S.C. § 1395ff. The Medicare Act, however, only provides for judicial review pursuant to 42 U.S.C. § 405(g) for part A claims and even then only if the amount in controversy is $1000 or greater. 42 U.S.C. § 1395ff(b)(2). The statute does not provide for judicial review of Part B claims and the Supreme Court has held that Congress specifically intended to preclude judicial review of Part B claims for reimbursement under 42 U.S.C. § 405(g). *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982).

Since plaintiffs allege constitutional due process claims, general federal question jurisdiction, 28 U.S.C. § 1331, would be appropriate were it not for the apparent bar created by 42 U.S.C. § 405(h). That provision states:

> The findings of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h). This section is made applicable to the Medicare Act by 42 U.S.C. § 1395ii.

The statute does not literally apply. Plaintiffs do not seek to "recover on any claim" for benefits. Rather they claim that the procedures used, including the review notices, were constitutionally inadequate and they seek injunctive relief—ordering the Secretary to make specific changes in her procedures. Nevertheless, the Supreme Court has construed "arising under" very broadly to encompass " 'both the standing and the substantive basis for the presentation' " of a claim. *Heckler v. Ringer*, — U.S. —, —, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975)). It has applied the bar to cases raising constitutional challenges. *See Heckler v. Ringer, supra; Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

Although in each of the Supreme Court's rulings the claim was styled a procedural challenge, if relief ultimately were granted the plaintiff would have received benefits or reimbursement. *See Ringer, supra* — U.S. at —, 104 S.Ct. at 2022 (for most plaintiffs, following "the declaration which [they] seek ... only essentially ministerial details will remain before [they] would receive reimbursement"); *Salfi, supra*, 422 U.S. at 760, 95 S.Ct. at 2464. The instant case is distinguishable since plaintiffs seek prospective relief against a continuing illegal practice rather than specific benefits.

*But cf. Heckler v. Ringer,* —— U.S. ——, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (jurisdiction rejected when declaratory relief was sought respecting reimbursement for prospective surgical procedure).

In addition, the cases in which the Court has held federal question jurisdiction precluded, even when constitutional procedural claims were in issue, were cases in which jurisdiction would ultimately lie under section 205(g) after a final disposition. The issue was whether the exhaustion requirement of section 205(g) had been satisfied or waived. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Here there is no possible claim under 205(g), 42 U.S.C. § 405(g).

Doubt as to whether this type of claim should be construed as barred by section 205(h), 42 U.S.C. § 405(h), should be resolved in favor of finding jurisdiction since the availability of judicial review for constitutional questions is generally "presumed." *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). *See also Trinity Memorial Hospital v. Associated Hospital Service, Inc.,* 570 F.2d 660, 665 (7th Cir.1977). Courts have found jurisdiction over claims challenging Medicare Part B procedures on constitutional grounds. *See Leduc v. Harris,* 488 F.Supp. 588, 590 (D.Mass.1980); *McClure v. Harris,* 503 F.Supp. 409, 412 (N.D.Cal. 1980) (jurisdiction over constitutional claims because they are collateral to claims for benefits), *rev'd on other grounds,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). *See also St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283, 291–93 (8th Cir.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976) (jurisdiction under § 1331 to consider provider's due process claim that hearing on reimbursement was inadequate). *But cf. Trinity Memorial Hospital v. Associated Hospital Service, Inc.,* 570 F.2d 660, 665 (7th Cir.1977) (although district court had no jurisdiction over provider's due process claims under § 1331, Court of Claims has jurisdiction over due process claim).

If the statute were construed to deprive all courts of jurisdiction over plaintiffs' substantial constitutional claims, that preclusion itself would present a due process constitutional problem. *See Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975); *Johnson v. Robison,* 415 U.S. 361, 367, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974). Federal jurisdiction over the constitutional claims would also seem to be required since the only persons to whom plaintiffs could present their due process claims would be hearing officers, who do not even have to be lawyers and who are employed by the private insurance company whose practices are being challenged. *See Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 1672 & n. 14, 72 L.Ed.2d 1 (1982).

Alternatively, jurisdiction is probably available under the mandamus statute. 28 U.S.C. § 1361. *Cf. Heckler v. Ringer,* —— U.S. ——, ——, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984) ("We have on numerous occasions declined to decide whether the third sentence of [42 U.S.C.] § 405(h) bars mandamus jurisdiction over claims arising under the Social Security Act."). The Second Circuit has held mandamus jurisdiction available in social security cases, despite section 205(h), for procedural challenges that are unrelated to the merits of a claim. *See Dietsch v. Schweiker,* 700 F.2d 865, 868 (2d Cir.1983); *Ellis v. Blum,* 643 F.2d 68 (2d Cir.1981). *See also Soberal-Perez v. Schweiker,* 549 F.Supp. 1164 (E.D.N.Y. 1982) (for claim seeking to require Secretary to provide Social Security notices in Spanish, mandamus jurisdiction available to determine whether constitutional duty exists and to review the agency action within the scope provided by the Administrative Procedure Act), *aff'd,* 717 F.2d 36 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).

■ Mandamus jurisdiction lies if the plaintiffs have "exhausted all avenues of relief and only if the defendant owes [them] a clear nondiscretionary duty." *Heckler v. Ringer,* —— U.S. ——, ——, 104 S.Ct. 2013, 2022, 80 L.Ed.2d 622 (1984).

The plaintiffs do not have another avenue for relief. Asserting their claims before a hearing officer would be of no value. *See Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976). If there is a duty, it arises under the Constitution and is not discretionary. *See Soberal-Perez v. Schweiker*, 549 F.Supp. 1164, 1169–70 (E.D.N.Y.1982), *aff'd*, 717 F.2d 36 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).

## IV. *Due Process*

The government does not contest plaintiffs' assertion that their interests in receiving medicare reimbursement are sufficient to invoke due process protections, including notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 261–62, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). *See also Schweiker v. McClure*, 456 U.S. 188, 102 S.Ct. 1665, 1671, 72 L.Ed.2d 1 (1982) ("We may assume that the District Court was correct in viewing the private interest in Part B payments as 'considerable,' though 'not quite as precious as the right to receive welfare or social security benefits.'"). The government argues, however, that the present notice and procedure used in the Medicare Part B program are constitutionally adequate.

Plaintiffs challenge many aspects of the procedure by which Medicare Part B claims are determined. They assert that both the initial and review notices are constitutionally inadequate as are the methods by which the carrier initially codes and determines claims. The challenge to the adequacy of the initial notice (EOMB form) is not addressed because, as already noted, the issue is *sub judice* in the District of Columbia federal courts. Plaintiffs also challenge the actual procedures used in the hearings—such as the lack of subpoena power, lack of precedent, and alleged *ex parte* communications between hearing officers and other carrier employees.

The claims must be examined using the balancing process articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The factors considered to determine whether certain procedures are constitutionally required are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. *See also Kraemer v. Heckler*, 737 F.2d 214, 221–23 (2d Cir.1984) (applying *Eldridge* balancing to due process challenge to Medicare procedures); *Gray Panthers I*, 652 F.2d 146, 165–66 (D.C.Cir.1981) (same). All procedures must be taken into consideration when assessing the adequacy of the process. *See Gray Panthers II*, 716 F.2d 23, 28 (D.C.Cir.1983).

The private interest remains the same—the claimant's need to obtain reimbursement for medical bills that he or she has already paid. The amounts involved may sometimes appear small, but to an elderly person living on a fixed income, they loom relatively large. Moreover, many small denials aggregated over a year may be substantial. The total cost of medical care to the elderly can be enormous. *See Kraemer v. Heckler*, 737 F.2d 214, 221 (2d Cir.1984). Congress enacted the Medicare program in 1965 to provide "help for old people who need assistance in meeting medical costs." S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S. Code Cong. & Ad.News 1943, 1964. The Part B medical insurance program was set up not only to aid the indigent elderly, but to provide security to all of the nation's elderly against overwhelming medical bills. *See id.* ("Government action should not be limited to measures that assist the aged only after they have become needy.").

## A. Notice

■ Plaintiffs claim the review notices are constitutionally inadequate in two respects. First, they are incomprehensible to most of the people who receive them, and second, they do not contain enough information about why reimbursement was denied and how the reimbursable amount was calculated to enable an individual or his or her representative to effectively appeal the decision.

"[N]otice must be of such nature as reasonably to convey the required information." *Mullane v. Central Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). It is essential to due process, for if notice is inadequate other procedural protections become illusory. *Gray Panthers II*, 716 F.2d 23, 32 (D.C.Cir. 1983).

Citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the Secretary asserts that due process only requires her to inform the claimant of the review determination decision and tell him or her of the right to a hearing before a hearing officer. She resists providing the information on the calculation of the reasonable charge plaintiffs assert is necessary for a beneficiary to be able to assess the accuracy of the determination. *Mullane* held that a notice meeting due process requirements is one reasonably calculated to "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657. *Mullane*, however, dealt with the due process problems presented when an action potentially affects persons whose addresses or even names are unknown. This case presents the issue of how much information an administrative agency is required to give a claimant and how clearly that information must be presented. These issues are governed by more recent case law which outlines the due process parameters of the procedures administrative agencies must use in determining entitlements to government benefits. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

### 1. *Readability*

The evidence at trial clearly established that the review notices could not be understood by the great majority of the beneficiaries who received them. *See also Gray Panthers I*, 652 F.2d 146, 169 (D.C.Cir.1981). The notices are not "tailored to the capacities and circumstances" of their intended recipients. *Goldberg v. Kelly*, 397 U.S. 254, 268–69, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). In *Goldberg* the Court found that merely providing a welfare recipient with the opportunity to submit in written form a statement of his or her position was not sufficient to satisfy due process because most recipients "lack the educational attainment necessary to write effectively and . . . cannot obtain professional assistance." *Id.* at 269, 90 S.Ct. at 1021. Similarly a large number of plaintiff class members cannot understand the notices they receive from the carriers and because the amounts in issue are not large most are not represented.

In support of its argument that notice is sufficient, the government cites *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984), a case holding that due process does not require the Secretary to provide written notices and information in Spanish to social security claimants. The court used a "reasonableness" standard to determine what type of notice was required and concluded that a "rule placing the burden of diligence and further inquiry on . . . a non-English speaking individual served in this country with a notice in English does not violate any principle of due process." *Id.* at 43. Yet the court also noted that due process "calls for procedures fitted to the circumstances of particular situations." *Id.* (quoting *Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)). The relevant circumstance of the *Soberal-Perez* case was that English is the official and predominant language of this country. The court im-

plied that those who do not speak English have an affirmative obligation to know that they need to seek help in understanding communications in English. The circumstances are very different in this case. The recipients of the review letters may think they understand or be hesitant to admit they do not understand them. The fact is that the letters are written at a level well beyond most in this segment of the population, with no discernable added benefit from complexity in information provided.

The language used is bureaucratic gobbledegook, jargon, double talk, a form of officialese, federalese and insurancese, and doublespeak. It does not qualify as English.

Finally, the *Mathews v. Eldridge* factor of the administrative and societal burden associated with requiring protective procedures distinguishes this case from *Soberal-Perez*. Although the burden of providing notices and information in Spanish may be substantial, the burden on the government of writing letters in a manner designed to communicate rather than obfuscate is not substantial. Elimination of code words and unnecessarily confusing language would go far toward achieving the goal of clarity with no loss in precision.

2. *Content of Review Determination Letters*

The information provided in the review determination letters is not sufficient to enable a beneficiary or his or her representative to determine either the actual basis of a denial of reimbursement or whether reimbursement has been calculated correctly. Plaintiffs have been denied due process since the notices do not detail reasons for adverse action. *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). Thus plaintiffs are effectively denied an "opportunity to meet" the case against them. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). *See also Wolf v. McDon-*

*nell*, 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974); Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1280–81 (1975).

In other contexts where a method of calculations is critical to the determination of how much a claimant is entitled to, courts require some explanation of how the agency calculated or arrived at a figure. *See, e.g., Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir.1980), *cert. denied*, 447 U.S. 935, 100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980); *Vargas v. Trainor*, 508 F.2d 485, 487 (7th Cir.1975), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975).

In resisting providing more information the government relies heavily on *Adams v. Harris*, 643 F.2d 995 (4th Cir.1981). *Adams* found adequate similar conclusory review determination letters sent to social security claimants. Like the letters challenged here the *Adams* letters were composed of standardized paragraphs with generalized "reasons" why benefits were not granted. As in this case, the notices were sent after a second level administrative reconsideration.

Differences between the procedures available to the plaintiffs in this case and social security claimants in *Adams* dictate a different result. All procedures must be taken into consideration when assessing the adequacy of the process received. *Gray Panthers II*, 716 F.2d 23, 28 (D.C.Cir. 1983). The differences between the two systems are substantial. After administrative reconsideration, a social security claimant has a right to a de novo hearing before an administrative law judge, followed by an appeal to the Appeals Council and finally appeal to the district court. A medicare Part B beneficiary is only entitled to a hearing before a carrier-appointed hearing officer, who, unlike an administrative law judge, apparently is not under any affirmative obligation to develop an unrepresented claimant's case. *Cf. Gold v. Secretary of H.E.W.*, 463 F.2d 38, 43 (2d Cir.1972). In Medicare Part B there is a much greater opportunity for an erroneous final decision as a result of inadequate notice. Since the

review notices provide the only real chance for a medicare beneficiary to obtain information necessary to effectively determine if something went wrong, the notices must be sufficiently clear and detailed. *Cf.* Friendly, Some Kind of Hearing, 123 U.Pa. L.Rev. 1267, 1280–81 (1975) ("The more forthcoming the agency has been in disclosing its grounds, the stronger should be its position in asking curtailment of other procedures.").

The government also argues that the welfare benefits cases, including *Goldberg*, are inapplicable since Part B is a voluntary program and not based on need. While this reasoning is probably sociologically erroneous, we assume for the sake of the argument that a medicare beneficiary's interest in medicare benefits is not as great as a welfare recipient's interest in benefits. *Schweiker v. McClure*, 456 U.S. 188, 102 S.Ct. 1665, 1669 n. 5, 72 L.Ed.2d 1 (1982). Although a reimbursement determination is not based on an assessment of individual need, many of the covered elderly do rely heavily on their coverage. More important, Congress enacted the program because of its finding of need. *See generally* 1965 U.S.Code Cong. & Ad.News 1943.

The nature of the interest is only one factor in determining what protections are due. *See Mathews v. Eldridge*, 424 U.S. 319, 340–49, 96 S.Ct. 893, 905–10, 47 L.Ed.2d 18 (1976). The other *Eldridge* factors support requiring more informative notices. The risk of erroneous determination is high. During the first three quarters of 1983, of 21,154 reviews conducted by GHI, 14,796 or 70% were reversed in whole or in part in favor of the claimant. At the hearing level, the reversal rate for the same period was a more modest but still substantial 33%. *See* Def.'s Ex.'s M, N, O,; Pl.'s Ex. 69A. Even more noteworthy is the remarkably low rate at which beneficiaries seek review of reimbursement decisions. An average 50,000 claims a day are filed. Only approximately 1500 of those seek review (3%) and only 20 request a hearing (.04%). The government argues that the high rate of reversal on appeal reflects the fact that only erroneous determinations are appealed. The argument is not persuasive. Defendant had the opportunity to do a scientific sampling and declined to do so. In addition, from the evidence submitted on the readability issue, testimony of plaintiffs, and judicial notice of the difficulty of the elderly in dealing with bureaucratic hurdles, it is apparent that numerous erroneous determinations are not appealed. The 62% average reimbursement rate also suggests that many claimants are not receiving what they are entitled to. Although "[b]are statistics rarely provide a satisfactory measure of the fairness of a decision-making process," *Mathews v. Eldridge*, 424 U.S. 319, 346, 96 S.Ct. 893, 908 & n. 29, 47 L.Ed.2d 18 (1976), statistics when combined with the other evidence show that there is an unacceptably high risk of error in the claim reimbursement process.

The government asserts that any additional information would only add to the complexity of the letter and would impose an unwarranted burden on the carrier in the form of time required to write review determination letters. The information undoubtedly would add to the length of the communication but details can be separated from other information and made available to those who do understand. Perhaps of greater significance is the prophylactic effect of requiring the carrier to explain the method by which it arrives at a figure. Requiring plain justification of the decision is a major protection against arbitrary and careless decisionmaking. The government has not demonstrated that the burden of supplying necessary information in comprehensible form would be great.

The government asserts that any deficiency in its letters is cured by the availability of telephone and walk-in access to people at the carrier who answer questions about notices. Although these services are commendable and undoubtedly beneficial to many, they do not compensate for inadequate initial notice of review for "only the aggressive receive their due process right to be advised of the reasons for the proposed action." *Vargas v. Trainor*, 508

F.2d 485, 490 (7th Cir.1974) (inadequate notice not cured by note that welfare recipient could contact case worker for more information), *cert. denied,* 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975). *See also Gray Panthers II,* 716 F.2d 23, 32 (D.C.Cir.1983); *Escalera v. New York City Housing Authority,* 425 F.2d 853, 862 (2d Cir.1970) (conference between project manager and tenant does not cure inadequacy of initial one-sentence notice of termination of public housing lease).

Apart from some skepticism about the claim that the oral explanation is much better than the written one, we take judicial notice of the fact that many of our elderly are afraid to, or incapable of, traveling to the carrier. Not every medicare recipient has the luxury of a home telephone and the cost of public phones has more than doubled in recent weeks. Moreover, it is doubtful that the infuriating problem of gaining telephone access to, and satisfaction from, any bureaucracy has been solved by the carrier.

### B. Fair Hearing

Under their contracts with the Secretary, carriers are required to establish procedures for fair hearings for reimbursement claims when the amount in controversy is $100 or more. 42 U.S.C. § 1395u(b)(3)(C). The Secretary has promulgated regulations to implement the fair hearing requirement. *See* 42 C.F.R. § 405.801 *et seq.* Plaintiffs claim the procedures presently used do not meet due process requirements. The specific problems they identify are: absence of subpoena power for hearing officers, *ex parte* communications between hearing officers and carrier employees, and the lack of independence of, and inadequate qualifications for, hearing officers.

Plaintiffs seek subpoena powers for hearing officers so that hearing officers and beneficiaries have some leverage when they ask treating physicians to supply more detailed information about the medical services provided. Under the Medicare Act the Secretary has subpoena power. *See* 42 U.S.C. §§ 405(d) (made applicable to the medicare program by 42 U.S.C. § 1395ii). The subpoenas are enforceable in the district courts and failure to obey an enforcement order is punishable by contempt. 42 U.S.C. § 405(e). The Secretary may delegate the power to "any member, officer, or employee of the Department of Health and Human Services." 42 U.S.C. § 405(*l* ). Hearing officers, who are not employees of the Secretary, do not have subpoena powers. The Government asserts that a hearing officer may request the Regional Administrator of the Health Care Financing Administration (HCFA) to issue a subpoena. This theoretical availability of a subpoena is apparently not known to hearing officers or beneficiaries.

Even assuming that this court had the power to grant hearing officers subpoena powers, the plaintiffs have not demonstrated that the accuracy of the hearing process would be substantially improved if subpoenas were more readily available. The hearing officer called as an expert by plaintiffs testified that he could not recall any case where it had been difficult to get necessary information. Transcript of Nov. 23, 1983, at 213–14. Unlike social security cases, subpoenas would not be used to secure information or testimony from parties whose interest is adverse to the beneficiary's. *Compare Fernandez v. Schweiker,* 650 F.2d 5 (2d Cir.1981) (reports of Secretary's examining doctor); *Treadwell v. Schweiker,* 698 F.2d 137 (2d Cir.1983) (employment records from former employer who may have failed to pay social security taxes). In addition if subpoenas were readily available plaintiffs arguably could be worse off if their use had the effect of deterring doctors from treating elderly patients.

Plaintiffs also complain about alleged *ex parte* communications between the hearing officers and carrier employees. Use of information obtained *ex parte* violates the due process right to an impartial hearing. *See Gullo v. Califano,* 609 F.2d 649 (2d Cir.1979); *Lonzollo v. Weinberger,* 534 F.2d 712 (7th Cir.1976). The evidence did not establish anything more than isolat-

ed instances of *ex parte* communications. The Secretary recognizes that they are improper and professes adherence to regulations which preclude reliance on them. *See, e.g.,* 42 C.F.R. § 405.830 (a hearing officer must provide parties to a hearing with "an opportunity to enter any objection to the inclusion of any document"); Medicare Carrier's Manual § 12020A ("When additional evidence is furnished after the hearing, parties must have the opportunity to read it and comment upon it."). Plaintiffs have not demonstrated a need for class-wide injunctive relief on this point.

Finally plaintiffs allege that Part B hearings fall below due process standards because hearing officers are not independent and are not sufficiently qualified. *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), governs this claim.

The court must begin with "the presumption that the hearing officers who decide Part B claims are unbiased." *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982). Plaintiffs have not rebutted that presumption. The fact that the officers are carrier employees and the fact that most worked in some other capacity for the carrier prior to becoming a hearing officer do not establish bias. *Id.* at 1670 & nn. 9, 10. Plaintiffs also cite the failure of hearing officers to correct past system-wide errors in methods of computing reimbursements as evidence that the hearing officers are biased. Even if there were evidence supporting this allegation, it does not rebut the presumption of impartiality. As pointed out below, the hearing officers are bound by the Secretary's regulations and guidelines. They cannot be blamed for system-wide errors.

In *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982), the Court approved the Secretary's requirements for qualifications of hearing officers as consistent with due process. Plaintiffs have produced no evidence to show that the hearing officers appointed by carriers fall short of the Secretary's qualifications. The only evidence on this issue plaintiffs presented was the testimony of William Woodson, a hearing officer at Blue Cross Blue Shield of Greater New York. Mr. Woodson testified that most hearing officers at that carrier are non-lawyers. He himself is an attorney who has had extensive experience, having been a hearing officer since 1964 and having decided over 10,000 Medicare Part B cases.

■ Due process does not require that hearing officers be lawyers. *Schweiker v. McClure,* 102 S.Ct., *supra,* at 1672 & n. 14. Lawyers have no monopoly on fairness, intelligence and good faith. Well-trained and supervised laypersons are capable of acting effectively as hearing officers. There is no basis for assuming that hearing officers are biased since they have no financial interest in the outcome of the claims they adjudicate.

## C. Precedent and Power to Overrule

Plaintiffs contend that they have been denied due process in the hearing of their claims because hearing officers are bound by, and may not overrule as inconsistent with the statute, the Secretary's regulations and other interpretive rules such as those in the Medicare Carriers Manual. As a corollary plaintiffs claim that due process requires that the decisions of hearing officers be given precedential effect.

A hearing officer is required to comply with HCFA policy guidance when the interpretation conflicts with his or her own views. 42 C.R.R. § 405.860. The regulation provides:

> The hearing officer in exercising the authority to conduct a hearing under section 1842(b)(3)(C) of the Act is to comply with all the provisions of title XVIII of the Act and regulations issued thereunder, as well as with policy statements, instructions and other guides issued by the Health Care Financing Administration in accordance with the Secretary's agreement with the carriers.

It would be strange to require that a Part B hearing officer, who does not need a law degree, have power to overrule expla-

nations of statutes and regulations in the administrative interpretations rendered by the Secretary. The Secretary has broad powers conferred on her by Congress to "prescribe standards for applying certain sections of the [Social Security] Act." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981) (quoted approvingly in *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983)). The Court's holding in *McClure* approving the use of carrier designated hearing officers without any administrative review only makes sense if the hearing officers, just as the carriers, are bound by the Secretary's guidelines as contained in the Medicare Carrier's Manual and other appropriate sources.

Plaintiffs do not claim that binding precedential effect is required for hearing officers' decisions. Rather, they seek access to the hearing decisions for beneficiaries so that they may use them in support of their claims.

Fair hearing decisions are not categorically ignored. The hearing officer who testified in this case said that he considered both his own past decisions and those of others that were brought to his attention. In addition, the evidence established that there is a procedure by which hearing officers can bring problems to the attention of HCFA which then can clarify an issue or resolve a problem by issuing guidelines or rules.

The real obstacle to beneficiaries' ability to use or benefit from past decisions is lack of access. Plaintiffs' proposed solution—access to a computer base containing the text of past decisions—is not available at present. Only stock paragraphs are computerized. The cost of requiring the government to computerize all decisions would be substantial and it is doubtful whether the capacity would be widely enough used and beneficial enough to justify the expense. Certainly, however, any past decisions actually relied upon by the hearing officer should be available to the beneficiary. More generally, any relevant decisions a hearing officer relies upon should be referred to in the hearing file. Any information protected by the Privacy Act, 42 U.S.C. § 1306(a), can be deleted.

The problem of access to information is not limited to hearing decisions. The evidence showed that the combined effect of inadequate notices, hearing files containing minimal information and general resistance to change and disclosure, led to mistakes that went uncorrected for years. Some were corrected only after persistent effort by a Congressman in one case and in another by a provider representative. The fact that the system does not supply enough information to allow for recognition and correction of problems does, therefore, present a due process problem.

## V. *Equal Protection*

■ Plaintiffs also seek relief on equal protection grounds, claiming that the procedures available to part B claimants as compared to those available to part A claimants deny them equal protection of the laws. Plaintiffs specifically point to the fact that part A claimants have the right in some instances to a hearing before an administrative law judge of the Social Security Administration and have the right to appeal that decision to a federal district judge. 42 U.S.C. § 1395ff. Part B claimants can receive a hearing on a denial of a claim only before a carrier-appointed hearing officer. *See United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) (holding that medicare statute precludes judicial review of amount of reimbursement under part B of medicare program).

The equal protection claims of the plaintiffs are without merit. In a case challenging part B hearings on due process grounds the Supreme Court has approved the use of carrier-appointed hearing officers with no administrative or judicial review. *Schweiker v. McClure*, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 1653–55 & n. 14, 72 L.Ed.2d 12 (1982).

The legislative history recounted in *Erika* makes it clear that Congress prescribed different review procedures for part A and part B claimants because part B payments were thought to be generally smaller than those under part A. *Id.* at 1654–55. In addition Congress sought to "avoid overloading the courts with quite minor matters." 118 Cong.Rec. 33,992 (1972) (statement of Senator Bennett). This distinction is rational. *Drs. Russi, Griffin & Snell, Ltd. v. Matthews,* 438 F.Supp. 1036 (E.D. Va.1977) (rational basis in difference in average amounts involved and also in difference in coverage, source of funds, and voluntary nature of part B); *McClure v. Harris,* 503 F.Supp. 409, 418 (N.D.Cal.1980), *rev'd on other grounds,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). *See also Rubin v. Weinberger,* 524 F.2d 497, 500 n. 4 (7th Cir.1975) (limitation of judicial review to part A claims of over $1000 does not violate equal protection since it is supported by rational basis). Just because some claims alone or in combination with others for reimbursement under part B may be for substantial amounts of money does not mean Congress could not rationally distinguish between the two programs on the basis of the amounts generally in issue. *See Drs. Russi, Griffin & Snell,* 438 F.Supp. 1036, 1043 (E.D.Va.1977).

### VI. *Remedy*

Inadequate notices can be remedied. Defendant is directed to take prompt action to ensure that notice is given in accordance with this opinion.

The problems of error identification and correction are more difficult to remedy. In view of the relatively small claims involved, it obviously is uneconomical for beneficiaries to retain counsel to prosecute their claims. It is unlikely that any specialized bar will ever be developed along the lines of the social security bar which has been effectively protecting the rights of those claiming benefits under the Social Security Act. *See, e.g., Tripodi v. Heckler,* 100 F.R.D. 736 (E.D.N.Y.1984); *Zimmerman v. Schweiker,* 575 F.Supp. 1436 (E.D.N.Y. 1983). It is difficult for the elderly to organize effective private associations on the model of veterans' organizations with the interest and resources necessary to provide a check on the system. But see the action brought by the Gray Panthers challenging other aspects of the Medicare Program in *Gray Panthers II,* 716 F.2d 23 (D.C.Cir.1983). *Pro se* application to the federal courts is of course prevented by the statute itself. 42 U.S.C. § 1395ff.

Apart from political inquiry by Congresspersons demonstrated in this case to be effective, one organization has shown the interest and capacity necessary to investigate and obtain relief—Legal Services for the Elderly. In this case the organization provided highly skilled and aggressive representation for the class through Toby Golick, Esq. in conjunction with Julia Spring, Esq. and Whitney North Seymour, Jr., Esq., acting pro bono in the highest traditions of the bar.

There is no practicable way for the court to furnish the resources to Legal Services for the Elderly that will permit it to continue its work. Assuming resources can be obtained, Legal Services for the Elderly or an equivalent organization may be able to continue to act effectively to check abuse by conducting future investigations, arranging voluntary changes and prosecuting litigations such as the one before the court. Accordingly, the defendants are directed to cooperate with Legal Services for the Elderly in furnishing necessary information to ensure that the statute is properly administered for the benefit of the class. This includes making information on internal studies available as reasonably requested. Legal Services for the Elderly may apply to the court on behalf of the class within the next two years should cooperation be denied.

This memorandum constitutes a final judgment and findings of fact and law. Should the parties require further findings or a more detailed judgment, they should submit proposals within thirty days; they must first confer with each other in an attempt to reach agreement as to form.

So ordered.