**Blanche FOX, Representative of the Estate of Walter Fox; David Blotner, Francis Ehrsam, individually and on behalf of all others similarly situated**

v.

**Otis R. BOWEN, Secretary, United States Department of Health and Human Services**

Civ. No. H–78–541 (JAC).

United States District Court,
D. Connecticut.

April 23, 1986.

Judgment Jan. 13, 1987.

Charles C. Hulin, Judith Stein Hulin, William A. Dombi, Willimantic, Conn. for plaintiffs.

Lawrence Burstein, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Introduction | 1237 |
| II. | Findings of Fact | 1238 |
|  | A. Description of the Plaintiff Class | 1239 |
|  | B. Plaintiffs' Need for Skilled Physical Therapy | 1239 |
|  | C. Defendant's Practice of Denying Medicare Coverage | 1240 |
|  | D. The Effects on Plaintiffs of Denials of Benefits | 1241 |
|  | E. Defendant's Coverage Determination Process | 1242 |
|  | F. Administrative Review of Denials of Benefits | 1242 |
| III. | Conclusions of Law | 1242 |
|  | A. Jurisdiction | 1242 |
|  | B. Merits | 1245 |
|  | 1. The Intermediaries' Practice of Denying Physical Therapy Claims | 1245 |
|  | 2. The Secretary's Procedures for Reviewing SNF Coverage Decisions | 1250 |
|  | C. Relief | 1251 |
| IV. | Conclusion | 1251 |

## INTRODUCTION

This action challenges practices and procedures that allegedly have been used by the Secretary of the United States Department of Health and Human Services ("the defendant" or "the Secretary")[1] to deny

---

1. Since the filing of this action, the name of the department of which the defendant is Secretary has been changed to the United States Department of Health and Human Services ("HHS").

Medicare benefits for physical therapy to a certified class of elderly Connecticut residents ("the plaintiffs").[2]

The plaintiffs contend that the defendant's biased procedures for reviewing Medicare claims and his practice of routinely denying Medicare coverage for certain categories of physical therapy rendered by skilled nursing facilities ("SNFs") violate their rights under Part A of Title XVIII of the Social Security Act ("the Medicare Act"), 42 U.S.C. §§ 1395–1395zz, and the Due Process Clause of the Fifth Amendment to the United States Constitution. The Medicare Act entitles members of the plaintiff class to payment of the "reasonable and necessary" costs of "post-hospital extended care services for up to 100 days during any spell of illness." 42 U.S.C. §§ 1395d(a)(2), 1395y(a)(1). These services are covered under Part A of Medicare only if the patient receives "skilled nursing care ... or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis." 42 U.S.C. § 1395f(a)(2)(C).

■ The Secretary may contract with private organizations (known as "fiscal intermediaries") for assistance in the administration of the Medicare Act.[3] The intermediaries determine the amount of Medicare reinbursement payable to SNFs and other service providers. 42 U.S.C.

§ 1395h(a). *See generally Kraemer v. Heckler*, 737 F.2d 214, 214–217 (2d Cir. 1984) (*"Kraemer"*) (general description of Medicare program). A decision by an intermediary denying coverage under Part A of the Medicare Act is subject to administrative and judicial review. 42 U.S.C. § 1395ff.

The plaintiffs request that the court enjoin and declare illegal the defendant's methods for determining eligibility for physical therapy coverage under Part A of Medicare and impose a new set of procedures in their place. In addition, the plaintiffs ask that the defendant be required to reconsider their claims for physical therapy benefits that previously were denied.

Upon a consideration of the full record of this case, including the testimony and exhibits offered at the four-day non-jury trial and the post-trial findings and memoranda submitted by the parties, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R. Civ.P.

## I. FINDINGS OF FACT

### A. DESCRIPTION OF THE PLAINTIFF CLASS

1. There are approximately 20,000 patients residing in Connecticut's 220 SNFs. Certified Official Transcript of Trial ("Tr.") at 143. The typical patient is in his early to mid–80s. Tr. 143, 313. Many of these

---

**2.** The original class consisted of "all Connecticut residents who, pursuant to the policies and practices of the defendant which are challenged herein, have been or will be denied Medicare Part A extended care coverage for physical therapy and rehabilitative services, and whose claims involve an amount in controversy not less than $1,000." *See* Ruling on Motion for Class Certification (filed May 5, 1980); Ruling on Defendant's Motion for Summary Judgment (filed Aug. 9, 1983) ("Summary Judgment Ruling") at 15 n. 1. By consent of the parties the definition of the plaintiff class has been narrowed by deletion of the words "or will be" as a result of the holding of the Supreme Court in *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (*"Ringer"*) (in order to meet the non-waivable jurisdictional requirement of 42 U.S.C. § 405(g), a claim must have

been presented to the Secretary). *See* Plaintiffs' Unopposed Motion for Modification of Class Definition (filed April 19, 1985 and granted April 22, 1985); *see also Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979) (class actions maintainable pursuant to 42 U.S.C. § 405(g) "so long as the membership of the class is limited to those who meet the requirements of [that section]").

**3.** Three fiscal intermediaries administer the Medicare Act in Connecticut. *See* Certified Official Transcript of Trial ("Tr.") at 261. Because the intermediaries are agents of the defendant, their practices are legally imputable to defendant. *See Kraemer v. Heckler,* 737 F.2d 214, 215 (2d Cir.1984) (*"Kraemer"*).

patients, perhaps as many as 50 percent, require physical therapy services in the nursing home. Tr. 192, 257.

2. Members of the plaintiff class often receive physical therapy as treatment for strokes, fractured hips, and other broken bones. Tr. 12, 246, 40–41.

3. The typical class member is afflicted with multiple disabilities that may complicate and prolong his rehabilitation. Tr. 50, 283, 311–312, 316. *See* 42 C.F.R. § 409.33(a)(1) (recognizing that patients with multiple disabilities often require more extensive nursing or rehabilitation services than do patients with a single disability).

## B. PLAINTIFFS' NEED FOR SKILLED PHYSICAL THERAPY

4. Physical therapy is a skilled profession. A physical therapist can achieve greater success in the rehabilitation of a patient than can a person who is untrained in physical therapy. Tr. 50, 75, 283–284, 293, 337.

5. Patients vary considerably in the extent and the speed of their response to a program of physical therapy. Tr. 316. *See* Plaintiffs' Exhibit 26 (Health Insurance Manual 13 ["HIM–13"]) at § 3101.8B(c), (d). For example, some stroke patients may respond slowly to physical therapy during their first weeks in the nursing home because of the effects of medication and emotional trauma. Tr. 22–24. It is therefore difficult to predict the physical therapy that will be required by a particular patient based on the experience of other patients. Tr. 22–24, 288.

6. The court credits the uncontroverted testimony of the plaintiffs' medical experts that daily skilled physical therapy is often required during each of the following stages of the patient's rehabilitation:

(a) Patients often need daily skilled physical therapy during the "non-weight-bearing" stage of rehabilitation. Tr. 52, 278–279, 285, 315.[4] This is the stage at which the patient cannot place his weight on his injured leg or foot. Such therapy may be necessary, for example, to prevent the patient's joints from stiffening and his muscles from wasting while his injury heals. Tr. 51, 285.

(b) A patient whose arm or leg has been amputated may often require daily skilled physical therapy during the period before he is fitted for a prosthesis. Amputees who do not receive physical therapy during this period may develop wasted stumps and contractures in their hips and may have a more difficult time when therapy eventually is begun. Tr. 84–85.

(c) A patient may require daily skilled physical therapy in order to maintain as well as to increase body strength and function. Tr. 317. For example, a patient with a hip fracture may require daily skilled physical therapy to prevent the remainder of his body from deteriorating during the period in which he is immobilized.

(d) A patient may require daily skilled physical therapy even if he is able to "ambulate" (that is, walk with the assistance of a walker or crutches) for up to 50 feet with supervision. Tr. 318–319.

(e) Passive "range of motion" exercises (that is, exercises in which the affected body part is moved by another person) may require the skilled supervision of a physical therapist on a daily basis. Tr. 73–74, 337.

(f) A patient may require daily skilled physical therapy for a period in excess of two weeks. Tr. 322.

## C. DEFENDANT'S PRACTICE OF DENYING MEDICARE COVERAGE

7. The defendant grants Medicare coverage for physical therapy to only a small

---

**4.** The defendant's claim that one of the plaintiffs' witnesses testified that "daily" therapy might not have been necessary for a particular patient in the "non-weight-bearing" stage of rehabilitation, *see* Defendant's Post-Trial Memorandum at 20 & n. 7, does not accurately reflect the record, *see* Tr. 295–298, where the witness stated that daily therapy was ideal and refused to concede that three days of therapy per week would have been adequate. *Id.* In any event, the witness's testimony was addressed to the case of a specific patient rather than to the cases of all patients in the "non-weight-bearing" stage of rehabilitation.

number of patients who demonstrate a rapid recovery of body function. Even these patients generally receive no more than two weeks of coverage. Tr. 13–14, 22, 54, 282, 344.

8. The defendant may deny coverage for daily skilled physical therapy even when such therapy has been ordered by the patient's treating physician. Tr. 33, 239–240.

9. It is the defendant's practice to deny coverage for physical therapy received during the "non-weight-bearing" stage of rehabilitation. Tr. 13, 51–52, 71, 285, 315.

10. It is the defendant's practice to deny coverage for physical therapy administered to amputees who have not yet been fitted with prostheses. Tr. 70–71, 84–85.

11. It is the defendant's practice to deny coverage to patients receiving "maintenance" physical therapy. Tr. 317–318.

12. It is the defendant's practice to terminate coverage for physical therapy when the patient is able to walk with the supervision of an aide. Tr. 18. However, as was established by uncontroverted expert testimony, such patients still may not recover fully unless they receive additional skilled physical therapy on a daily basis. Tr. 18–20, 84.

13. It is the defendant's practice to terminate coverage once the patient is able to ambulate 50 feet with supervision. Tr. 61. However, as was established by undisputed expert testimony, the distance that a patient is able to ambulate with supervision is not, by itself, determinative of his need for daily skilled physical therapy. Tr. 318.

14. It is the defendant's practice to deny coverage for physical therapy that consists of passive "range-of-motion" exercises. Tr. 74–76.

15. The reason typically advanced by an intermediary to justify the denial of Medi-

care coverage is that the physical therapy required by the patient is not "skilled." Tr. 74–75. However, as was established by credible expert testimony, the intermediaries often deny coverage without giving adequate consideration to the physical therapy skills required in a particular case. Tr. 102, 311, 313, 344.[5]

16. Before acting on a claim, SNF personnel may telephone the intermediary to discuss whether the patient is covered by Medicare. Tr. 28–29, 240–241, 328–329, 220–221. However, the testimony at trial revealed few instances in which these informal communications significantly affected an intermediary's coverage determinations. Tr. 19–21.

## D. THE EFFECTS ON PLAINTIFFS OF DENIALS OF BENEFITS

17. Skilled physical therapy can enable many elderly patients to leave the nursing home and return to the community to live independently. Tr. 282–284, 313, 315–316. Indeed, as one of the plaintiffs' experts testified credibly, if more elderly persons received skilled physical therapy after sustaining a stroke or fracture, fewer of these persons would have to spend the remainder of their lives in nursing homes. Tr. 316, 326.

18. Patients who are denied Medicare coverage are responsible for paying for their own physical therapy through insurance, personal savings or contributions from family members. Tr. 50, 56, 164, 211. In such circumstances, many patients forgo medically necessary physical therapy because they or their families believe that they cannot afford to pay for such therapy themselves. Tr. 8, 21, 26–27, 43–44, 49–50, 56–57.

19. A patient's recovery may be jeopardized, according to the credible and uncontroverted testimony of the plaintiffs' medi-

5. The defendant claims that one witness's testimony that intermediaries use the term "skill" not as a factual concept but merely "to imply a threshold beyond which they were not prepared to pay" is undermined because the witness did not understand the regulatory definition of "skill." Defendant's Post-Trial Memorandum at 18–19 & n. 6. This argument is without merit in

view of other testimony by the witness that revealed his understanding that "skilled nursing and skilled rehabilitation services" are defined for purposes of Medicare as services "furnished directly by *or under the supervision of* [personnel such as physical therapists]." 42 C.F.R. § 409.31(a)(3) (emphasis supplied). *See* Tr. 340–341.

cal experts, if the patient forgoes medically necessary physical therapy during the weeks immediately following his injury or illness. Tr. 25–27, 56–57, 283–284. In some cases, a patient's recovery is also inhibited by the emotional distress that may result from a denial of Medicare coverage. Tr. 25–26.

20. Accordingly, the denial of medically necessary physical therapy benefits has significant physiological, emotional and financial implications for many members of the plaintiff class.

## E. DEFENDANT'S COVERAGE DETERMINATION PROCESS

21. The SNF is responsible as an initial matter for determining whether a newly admitted patient is to receive Medicare coverage. Tr. 13, 144, 48; HIM–13 at § 3439.-1. If the SNF decides that the services to be received by the patient are covered by Medicare, but the intermediary later reverses the SNF's decision, the SNF must absorb the cost of any such services if it "knew, or could be expected to know, that payment for such services ... could not be made" under Part A of Medicare. 42 U.S.C. § 1395pp(b), Tr. 64.

22. An SNF that grants a claim for Medicare coverage is required to provide the intermediary with extensive documentation of the patient's medical condition, the services rendered to the patient, and the extent of the patient's recovery. Tr. 212–213; Plaintiffs' Exhibit 2f (Deposition of Jeremiah Flynn, an employee of the defendant ["Flynn Deposition"]) at 10. The intermediary may decide on the basis of this information to reverse the SNF's initial award of coverage to the patient. Tr. 147–148. The SNF may then be liable for the cost of any services erroneously rendered to the patient.

23. However, when the SNF denies a claim for Medicare coverage, the SNF is not required to provide the intermediary with any information concerning the patient's condition (aside from his admitting diagnosis) or the treatment that may have been ordered by the physician or rendered by the SNF. Tr. 214–215; Flynn Deposi-tion at 20–21, 30. The SNF is required to provide additional documentation to the intermediary only if the patient seeks reconsideration of the SNF's denial of benefits. Accordingly, an SNF's denials of coverage are rarely, if ever, questioned by the intermediary unless the patient has requested reconsideration. Tr. 29, 147, 329.

24. The Secretary formerly provided a coverage determination procedure, sometimes called a "presumption of non-liability," whereby the SNF was presumed not to have known or to have had reason to know that the services provided to a patient were not covered under Medicare. The SNF was entitled to this "presumption of non-liability" only if it met a "denial rate criterion" established by the Secretary. HIM–13 § 3433. The "denial rate criterion" was satisfied if, of the total number of days of care deemed by the SNF to be covered by Medicare, no more than 5 percent were later denied coverage by the intermediary. HIM–13 §§ 3433, 3434. An SNF's denial rate would typically rise when one of its decisions to grant coverage was reversed by the intermediary; if its denial rate rose above 5 percent, the SNF would lose its "presumption of non-liability" and would be liable for the cost of any further coverage allowed by the SNF but later denied by the intermediary. Tr. 52, 145–146; HIM–13 § 3433. An SNF could at least theoretically have lost its "presumption of non-liability" by erroneously denying coverage in more than 10 percent of its total claims, see HIM–13 § 3439.2; however, there was no evidence that an SNF was ever threatened with the loss of its "presumption of non-liability" for denials rather than awards of coverage. The "presumption of non-liability" was eliminated by the Secretary in revised regulations that took effect March 24, 1986. 51 Fed.Reg. 6222 (Feb. 21, 1986).

25. Because SNFs were more likely to lose their "presumption of non-liability" by erroneously granting coverage than by erroneously denying coverage, see Findings of Fact 22–24, supra, some SNFs tended to decide "questionable" claims by "erring always on the side of denying, rather than

allowing" coverage in order to preserve their "presumption of non-liability." Tr. 148–149, 328.

### F. ADMINISTRATIVE REVIEW OF DENIALS OF BENEFITS

26. Between January 1, 1977 and September 30, 1979, the number of initial coverage determinations issued by Medicare intermediaries for patients residing in Connecticut nursing homes was 74,815, or 2,267 each month. Plaintiffs' Exhibit 11 (Defendant's Answers to Plaintiffs' First Interrogatories) at 4. Approximately 98 percent of these determinations were denials. Tr. 186, 167. Plaintiffs' Exhibit 15.

27. A substantial percentage of these denials were for physical therapy benefits. For example, a former administrative law judge at the Social Security Administration Office of Hearings and Appeals in Hartford, Connecticut, who ruled on approximately 300 Medicare cases between 1972 and 1982, testified credibly that approximately 250 of these cases concerned claims for SNF coverage in which physical therapy was an "important component." Tr. 95. He granted additional coverage in 75 percent to 80 percent of the physical therapy cases; typically, he gave the claimants "most, if not all" of the relief that they had requested. Tr. 102–104.

28. In addition, the record contains two surveys of cases in which initial denials of Medicare coverage to SNF patients were appealed by Legal Assistance to Medicare Patients. Of these 503 cases, 292, or 58 percent, involved claims for physical therapy. Tr. 257, 192; Plaintiffs' Exhibits 14, 20. Of the 292 cases in which physical therapy coverage had been denied, 82 percent were eventually reversed on appeal to the intermediary, the Secretary or a federal

district court. Tr. 193, 259; Plaintiffs' Exhibit 20.

29. Few denials of Medicare coverage for SNF services are ever appealed. For example, in the period from January 1, 1977 to September 30, 1979, only 2.4 percent of all SNF initial determinations were appealed for reconsideration by the intermediary and only 0.3 percent were taken to a subsequent hearing before an administrative law judge. Defendant's Answer to Plaintiffs' Interrogatories at 5, 6 (Plaintiffs' Exhibits 12, 13). The failure of many SNF patients to appeal their denials of benefits is attributable in significant part to their age and ill health. Tr. 184, 344–345. *See also David v. Heckler*, 591 F.Supp. 1033, 1044 (E.D.N.Y.1984) (Weinstein, C.J.) (taking judicial notice that "numerous erroneous determinations [of Medicare Part B benefits] are not appealed" because of "the difficulty of the elderly in dealing with bureaucratic hurdles").

30. It often takes more than a year to appeal a denial of Medicare benefits. For example, the family of one of the plaintiffs waited sixteen months between his initial denial in November 1977 and the Secretary's decision granting benefits in March 1979. Plaintiffs' Exhibit 1 (Transcript in Case of Walter Fox). This delay is not atypical. Plaintiffs' Exhibits 14, 20.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

As a threshold matter, the defendant, relying on the decision of the Supreme Court in *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) ("*Ringer*"), contends that the court lacks jurisdiction over this action pursuant to 42 U.S.C. § 405(g).[6]

---

**6.** 42 U.S.C. § 405(g) provides, in pertinent part:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United

States for the judicial district in which the plaintiff resides or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

This section is made applicable to the Medicare Act by 42 U.S.C. § 1395ff.

The defendant previously (and unsuccessfully) challenged the court's jurisdiction over this ac-

Section 405(g) requires that a claimant exhaust administrative remedies before proceeding in federal court. *See Ringer, supra,* 466 U.S. at 617, 104 S.Ct. at 2022. There are two requirements for exhaustion under Section 405(g): First, there is the so-called "nonwaivable" requirement that a claim for benefits previously must have been presented to the Secretary. *See id.; Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976); *City of New York v. Heckler,* 742 F.2d 729, 735 (2d Cir.1984) (Newman, J.) (*"City of New York"*), *aff'g* 578 F.Supp. 1109 (E.D. N.Y.1984) (Weinstein, C.J.), *aff'd,* — U.S. ——, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). . There can be no doubt that the members of the plaintiff class, who by definition have had claims for Medicare benefits denied by the Secretary, have satisfied the presentment requirement. *See Ringer, supra,* 466 U.S. at 617, 104 S.Ct. at 2022; *City of New York, supra,* 742 F.2d at 735; Plaintiffs' Memorandum in Response to Defendant's Memorandum on the Significance of *City of New York v. Heckler* (filed Jan. 7, 1985) at 3–4 (describing defendant's denial of plaintiffs' claims); Recommended Ruling on Motion to Dismiss (filed Dec. 19, 1979) ("Motion to Dismiss Ruling") (Eagan, M.) at 3 *adopted by endorsement ruling* (entered Dec. 26, 1979) (Clarie, C.J., to whom this case originally was assigned).

Second, there is the so-called "waivable" requirement that a claim for benefits must have been fully pursued at the administrative level. *See Ringer, supra,* 466 U.S. at 617, 104 S.Ct. at 2022; *City of New York, supra,* 742 F.2d at 735. This exhaustion requirement may be dispensed with by the courts in appropriate circumstances. *See Ringer, supra,* 466 U.S. at 618, 104 S.Ct. at 2023; *City of New York, supra,* 742 F.2d at 736.

The circumstances in which such "judicial waiver" of the exhaustion requirement may be appropriate were described by our Court of Appeals in *City of New York,* a case decided after *Ringer.* The court held that

> [t]he Supreme Court has adopted a practical approach to section 405(g)'s exhaustion requirement. The Court has approved judicial waiver where plaintiff's legal claims are collateral to the demand for benefits, where exhaustion would be futile, or where the harm suffered pending exhaustion would be irreparable. ... In the absence of express guidance [from the Supreme Court as to whether futility, collaterality and irreparable harm must all be present for judicial waiver of the exhaustion requirement], we have taken the view that no one factor is critical. [citation omitted] We have adopted a more general approach, balancing the competing considerations to arrive at a just result under the circumstances presented.

*City of New York, supra,* 742 F.2d at 736. In that case, which involved a challenge to an improper presumption used by the Secretary to determine eligibility for Social Security disability benefits, the Court of Appeals held that judicial waiver was appropriate where irreparable harm existed, exhaustion would have been futile to vindicate procedural rights and the claim was at least "substantially" collateral to the entitlement to benefits. *Id.* at 736–737. The court will consider the application of each of these three criteria to the facts of the instant case.

First, with respect to the issue of irreparable harm, the court holds that in the instant case, as in *City of New York, supra,* 742 F.2d at 736, the "claimants have raised a colorable claim that recovery of retroactive benefits would not be fully compensatory." Many of the plaintiffs who discontinued their physical therapy prematurely so as not to exhaust their personal financial resources will never be able to achieve as complete a recovery as would

---

tion. *See* Recommended Ruling on Motion to Dismiss (filed Dec. 19, 1979) (Eagan, M.) at 2–7, *adopted by endorsement ruling* (entered Dec. 26, 1979) (Clarie, C.J., to whom this case originally was assigned). To the extent that the applicable law has changed since the denial of defendant's

motion to dismiss, the issue of subject matter jurisdiction properly may be entertained at this juncture. *See* Rule 12(h)(3), Fed.R.Civ.P. However, to the extent that the same legal criteria are still relevant, the earlier ruling is the law of the case.

have been possible had their benefits not initially been denied. *See* Findings of Fact 19, 20. Moreover, for some of the plaintiffs in the instant case, as for some of the plaintiffs in *City of New York*, "the trauma of having ... benefits cut off" may itself have "trigger[ed] a severe medical setback" that cannot be cured by an eventual award of benefits. 578 F.Supp. at 1118. *See* Findings of Fact 19, 20. Finally, the court has found in the instant case, as the district court found in *City of New York*, that "[b]ecause of their disability, many members of the [plaintiff] class were incapable of challenging the bureaucracy," 578 F.Supp. at 1118, and therefore were unable to avoid the permanent loss of their benefits. *See* Finding of Fact 29.

Second, the court holds that the claims of the plaintiff class are at least "substantially" collateral to the benefit claims of the individual class members. *See City of New York, supra,* 742 F.2d at 737. The instant case is clearly distinguishable in this respect from *Ringer, supra,* 466 U.S. at 615–616, 104 S.Ct. at 2021–22, where the Court found that the respondents were merely claiming that they should be reimbursed for certain surgical procedures and that, if the respondents prevailed, "only essentially ministerial details will remain before [they] would receive reimbursement." The court has previously concluded in the instant case, however, that the "plaintiffs do not allege that use of a new eligibility standard will automatically entitle them to benefits or physical therapy." Motion to Dismiss Ruling at 4–5. *See generally David v. Heckler,* 591 F.Supp. at 1039 ("The instant case is distinguishable [from *Ringer*] since plaintiffs seek prospective relief against a continuing illegal practice rather than specific benefits.").

It is true that the plaintiffs' challenge to the defendant's practice of denying Medicare coverage for certain categories of physical therapy is not wholly collateral to the plaintiffs' individual claims for benefits. However, this claim is similar to the claim of the plaintiffs in *City of New York* that was held to be "substantially" collateral to their claims for benefits and therefore to "present an appropriate circum-

stance for waiver." 742 F.2d at 737. In *City of New York,* the plaintiffs argued that the Secretary employed an across-the-board presumption instead of making the required individualized determination of each claimant's eligibility for disability benefits; in the instant case, the plaintiffs argue that the Secretary denies Medicare benefits on the basis of informal "rules of thumb" that fail to take into account each claimant's individualized need for the daily skilled physical therapy to which he is entitled under the applicable statute and regulations. Accordingly, the court holds that in this case, as in *City of New York,* "the [plaintiff] class ... complains fundamentally of a procedural irregularity and not of the Secretary's substantive standards of eligibility," *id.* at 737, and therefore has stated a claim that is sufficiently collateral to the benefit claims of its members to permit waiver of the exhaustion requirement.

█ Finally, the court holds that the plaintiffs have also satisfied the futility requirement because in the instant case, as in *City of New York, supra,* 742 F.2d at 737, "[a]lthough exhaustion might have resulted in recovery of ... benefits for some members of the class, as was also true in [*Mathews v. Eldridge* ], the administrative process cannot vindicate the procedural rights asserted in this litigation." It would be just as unrealistic in this case as it was in *Mathews v. Eldridge* and *City of New York* to "expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient ... in an an adjudicatory context." *Mathews v. Eldridge, supra,* 424 U.S. at 330, 96 S.Ct. at 900; *City of New York, supra,* 742 F.2d at 737. There is no evidence in the instant case that the Secretary has "consider[ed] substantial changes" in his procedures for evaluating claims for physical therapy benefits despite the frequency with which his initial denials of such benefits have been reversed by administrative law judges and federal district courts. *See* Findings of Fact 27, 28. Indeed, the aged and infirm have been offered no assurance that the

Secretary will ever consider such changes no matter how many more denials of physical therapy benefits are reversed on appeal.

Accordingly, after "balancing the competing considerations [of futility, collaterality and irreparable harm] to arrive at a just result under the circumstances presented," *City of New York, supra,* 742 F.2d at 736, the court concludes that the plaintiffs have met the waivable as well as the nonwaivable requirements for jurisdiction pursuant to 42 U.S.C. § 405(g). It is therefore unnecessary to consider the plaintiffs' claim that the court may also exercise mandamus jurisdiction over this action pursuant to 28 U.S.C. § 1361.

## B. MERITS

The plaintiffs make two claims on the merits. First, they allege that the intermediaries' practice of routinely denying allegedly meritorious claims for physical therapy coverage violates applicable statutes and regulations. Second, they claim that the defendant's former "waiver of liability" procedure is impermissibly biased because it has encouraged SNFs to deny allegedly meritorious claims. It is asserted that these practices, alone and in combination, have deprived the plaintiffs of a protected property interest without due process of law in violation of the Fifth Amendment to the United States Constitution.

### 1. *The Intermediaries' Practice of Denying Physical Therapy Claims*

The testimony at trial established a practice on the part of the intermediaries of denying physical therapy benefits under Part A of Medicare for maintenance therapy, for non-weight-bearing therapy administered to fracture patients, for passive "range-of-motion" activities, for patients who can ambulate 50 feet with supervision and for amputees who have not been fitted with prostheses. *See* Findings of Fact 9, 10, 11, 12. The testimony also established that the intermediaries generally allow Medicare coverage for no more than two weeks of physical therapy. *See* Finding of Fact 8. The court holds for the following reasons that these practices deny patients coverage for skilled physical therapy that otherwise might be covered by Medicare, *see* Finding of Fact 6, and are contrary to the applicable law and regulations. The high rate of reversal of intermediary denials, *see* Findings of Fact 27, 28, is indicative of the incorrectness of the intermediaries' practices.

■ The Secretary has promulgated regulations with respect to the physical therapy services covered by Medicare. *See* 42 C.F.R. § 409.30–409.36.[7] In addition, he has published a Health Insurance Manual

---

**7.** The court, rejecting various challenges by the plaintiffs, previously has upheld the validity of the defendant's regulations. Summary Judgment Ruling at 4–10.

42 C.F.R. § 409.31 provides, *inter alia:*

(a) *Definition.* As used in this section, "skilled nursing and skilled rehabilitation services" means services that:

(1) Are ordered by a physician;

(2) Require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologist; and

(3) Are furnished directly by, or under the supervision of, such personnel.

(b) *Specific conditions for meeting level of care requirements.*

(1) The beneficiary must require skilled nursing or skilled rehabilitation services, or both, on a daily basis.

\* \* \* \* \* \*

(3) The daily skilled services must be ones that, as a practical matter, can only be provided in a SNF, on an inpatient basis.

42 C.F.R. § 409.32 provides:

(a) The service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel.

(b) A condition that does not ordinarily require skilled services may require them because of special medical complications. Under those circumstances, a service that is usually non-skilled (such as those listed in § 409.33(d)) may be considered skilled because it must be performed or supervised by skilled nursing or rehabilitation personnel....

(c) The restoration potential of a patient is not the deciding factor in determining whether skilled services are needed. Even if full recovery or medical improvement is not possible, a patient may need skilled services to prevent further deterioration or preserve current capabilities....

42 C.F.R. § 409.33 provides, *inter alia:*

(a) *Services that could qualify as either skilled nursing or skilled rehabilitation services—*

(1) *Overall management and evaluation of care plan.* The development, management,

and evaluation of a patient care plan based on the physician's orders constitute skilled services when, because of the patient's physical or mental condition, those activities require the involvement of technical or professional personnel in order to meet the patient's needs, promote recovery, and ensure medical safety. This would include the management of a plan involving only a variety of personal care services when, in light of the patient's condition, the aggregate of those services requires the involvement of technical or professional personnel. For example, an aging patient with a history of diabetes mellitus and angina pectoris who is recovering from an open reduction of a fracture of the neck of the femur requires, among other services, careful skin care, appropriate oral medications, a diabetic diet, an exercise program to preserve muscle tone and body condition, and observation to detect signs of deterioration in his or her condition or complications resulting from restricted, but increasing mobility. Although any of the required services could be performed by a properly instructed person, such a person would not have the ability to understand the relationship between the services and evaluate the ultimate effect of one service on the other. Since the nature of patient's condition, age, and immobility create a high potential for serious complications, such an understanding is essential to ensure that patient's recovery and safety. Under these circumstances the management of the plan of care would require the skills of a nurse even though the individual services are not skilled. Skilled planning and management activities are not always specifically identified in the patient's clinical record. Therefore, if the patient's overall condition would support a finding that recovery and safety can be assured only if the total care is planned, managed, and evaluated by technical or professional personnel, it would be appropriate to infer that skilled services are being provided.

(2) *Observation and assessment of the patient's changing condition.* Observation and assessment constitute skilled services when the skills of a technical or professional person are required to identify and evaluate the patient's need for modification of treatment for additional medical procedures until his or her condition is stabilized.... Likewise, surgical patients transferred from a hospital to a skilled nursing facility while in the complicated unstabilized post-operative period, *e.g.,* after a hip prosthesis or cataract surgery, may need continued close skilled monitoring for post-operative complications, and adverse reaction....

\* \* \* \* \* \*

(c) *Services which would qualify as skilled rehabilitation services.*

(1) Ongoing assessment of rehabilitation need and potential: Services concurrent with the management of a patient care plan, including tests and measurements of range of motion, strength, balance, coordination, endurance, functional ability, activities of daily living, perceptual deficits, speech and language or hearing disorders;

(2) Therapeutic exercises or activities: Therapeutic exercises or activities which, because of the type of exercises employed or the condition of the patient, must be performed by or under the supervision of a qualified physical therapist or occupational therapist to ensure the safety of the patient and the effectiveness of the treatment;

(3) Gait evaluation and training: Gait evaluation and training furnished to restore function in a patient whose ability to walk has been impaired by neurological, muscular, or skeletal abnormality;

(4) Range of motion exercises: Range of motion exercises which are part of the active treatment of a specific disease state which has resulted in the loss of, or restriction of, mobility (as evidenced by a therapist's notes showing the degree of motion list and the degree to be restored);

(5) Maintenance therapy: Maintenance therapy, when the specialized knowledge and judgment of a qualified therapist is required to design and establish a maintenance program based on an initial evaluation and periodic reassessment of the patient's needs, and consistent with the patient's capacity and tolerance....

\* \* \* \* \* \*

(d) *Personal care services.* Personal care services which do not require the skill of qualified technical or professional personnel are not skilled services except under the circumstances specified in § 409.32(b). Personal care services include, but are not limited to, the following:

\* \* \* \* \* \*

(13) General supervision of exercises which have been taught to the patient; including the actual carrying out of maintenance programs, *i.e.,* the performance of the repetitive exercises required to maintain function do not require the skills of a therapist and would not constitute skilled rehabilitation services (see paragraph (c) of this section). Similarly, repetitious exercises to improve gait, maintain strength, or endurance; passive exercises to maintain range of motion in paralyzed extremities, which are not related to a specific loss of function; and assistive walking do not constitute skilled rehabilitation services.

42 C.F.R. § 409.34 provides, *inter alia:*

(a) To meet the daily basis requirement specified in § 409.31(b)(1), the following frequency is required:

(1) Skilled nursing services or skilled rehabilitation services must be needed and provided 7 days a week; or

(2) As an exception, if skilled rehabilitation services are not available 7 days a week, those services must be needed and provided at least 5 days a week.

13 ("HIM–13"), which is intended to guide intermediaries in determining whether individual claims for payment are to be covered by Medicare.[8] The applicable regulations

8. Summary judgment was granted in favor of defendant on the issue of whether HIM–13 was promulgated in violation of applicable statutes and federal regulations. *See* Summary Judgment Ruling at 14.

HIM–13 § 3101.8 provides, in pertinent part:

A. *General.*—To be covered physical therapy services the services must relate directly and specifically to an active written treatment regimen established by the physician after any needed consultation with the qualified physical therapist and must be reasonable and necessary to the treatment of the individual's illness or injury.

B. *Reasonable and Necessary.* To be considered reasonable and necessary the following conditions must be met:

(a) The services must be considered under accepted standards of medical practice to be a specific and effective treatment for the patient's condition,

(b) The services must be of such a level of complexity and sophistication or the condition of the patient must be such that the services required can be safely and effectively performed only by a qualified physical therapist or under his supervision. Services which do not require the performance or supervision of a physical therapist are not considered reasonable or necessary physical therapy services, even if they are performed or supervised by a physical therapist. (When the intermediary determines the services furnished were of a type that could have been safely and effectively performed only by a qualified physical therapist or under his supervision, it should presume that such services were properly supervised. However, this assumption is rebuttable and if in the course of processing claims, the intermediary finds that physical therapy services are not being furnished under proper supervision, the intermediary should deny the claim.)

(c) There must be an expectation that the condition will improve significantly in a reasonable (and generally predictable) period of time based on the assessment made by the physician of the patient's restoration potential after any needed consultation with the qualified physical therapist or the services must be necessary to the establishment of a safe and effective maintenance program required in connection with a specific disease state, and

(d) The amount, frequency, and duration of the services must be reasonable.

\* \* \* \* \* \*

1. *Restorative Therapy.* To constitute physical therapy a service must, among other things, be reasonable and necessary to the treatment of the individual's illness. If an individual's expected restoration potential would be insignificant in relation to the extent and duration of physical therapy services required to achieve such potential, the physi-

cal therapy would not be considered reasonable and necessary. In addition, there must be an expectation that the patient's condition will improve generally predictable) period of time. However, if any any point in the treatment of an illness, it is determined that the expectations will not materialize, the services will no longer be considered reasonable and necessary; and they, therefore, should be excluded from coverage under [42 U.S.C. § 1395y(a)(1)].

2. *Maintenance Program.* The repetitive services required to maintain function generally do not involve complex and sophisticated physical therapy procedures, and consequently the judgment and skill of a qualified physical therapist are not required for safety and effectiveness. However, in certain instances the specialized knowledge and judgment of a qualified physical therapist may be required to establish a maintenance program. For example, a Parkinson patient who has not been under a restorative physical therapy program may require the services of a physical therapist to determine what type of exercises will contribute the most to maintain the patient's present functional level.

In such situations the initial evaluation of the patient's needs, the designing by the qualified physical therapist of a maintenance program which is appropriate to the capacity and tolerance of the patient and the treatment objectives of the physician, the instruction of the patient or supportive personnel, *e.g.,* aides or nursing personnel (or family members where physical therapy is being furnished on an outpatient basis) in carrying out the program and such infrequent reevaluations as may be required would constitute physical therapy.

Where a patient has been under a restorative physical therapy program, the physical therapist should regularly be reevaluating the condition and adjusting any exercise program in which the patient is engaged. Consequently, when it is determined that no further restoration is possible, the physical therapist should have already designed the maintenance program required and instructed the patient, supportive personnel (or family members where physical therapy is being furnished on an outpatient basis) in the carrying out of the program. Therefore, where a maintenance program is not established until after the restorative physical therapy program has been completed, it would not be considered reasonable and necessary to the treatment of the patient's condition and would be excluded from coverage under [42 U.S.C. § 1395y(a)(1)].

C. *Application of Guidelines.* The following discussion illustrates the application of the above guidelines to the more common modali-

and the relevant portions of HIM–13 clearly contemplate that each patient will receive an individualized assessment of his need for daily skilled physical therapy based on the facts and circumstances of his particular case.

For example, the regulations authorize coverage for physical therapy "exercises or activities which, because of the *type of exercises employed* or the *condition of the patient,* must be performed by or under the supervision of a qualified physical therapist or occupational therapist to ensure the safety of the patient and the effectiveness of the treatment." 42 C.F.R. § 409.-33(c)(2) (emphasis added). The regulations similarly provide that maintenance physical therapy will qualify for Medicare coverage "when the specialized knowledge and judgment of a qualified therapist is required to design and establish a maintenance program *based on an initial evaluation and periodic reassessment of the patient's needs, and consistent with the patient's capacity and tolerance.*" 42 C.F.R. § 409.33(c)(5) (emphasis added). The regulations likewise allow coverage for "[r]ange of motion exercises which are part of the active treatment of a specific disease state which has resulted in a loss of, or restriction of, mobility (as evidenced by a therapist's notes showing *the degree of motion lost and the degree to be restored*)." 42 C.F.R. § 409.33(c)(4) (emphasis added).

It is clearly contrary to such regulations for an intermediary to deny benefits on the basis of informal presumptions, or "rules of thumb," that are applied across the board without regard to the medical condition or therapeutic requirements of the individual patient. *Cf. City of New York, supra,* 742 F.2d at 732–733 (enjoining administrative practice of employing a presumption in Social Security disability determinations that was inconsistent with applicable law).

This is not to say that all or even most of the class members who were denied coverage for physical therapy as a result of the intermediaries' inflexible and arbitrary practices ought to have received coverage. However, the Secretary cannot permit his intermediaries to use blanket rules not supported or authorized by any applicable law or regulations to deny what otherwise might be meritorious claims.

The various arguments offered by the Secretary in support of the intermediaries' practices are unpersuasive and unsupported by the record of this case. In his Post-Trial Memorandum (filed July 13, 1984) at 20 & n. 7, the Secretary argues that physical therapy benefits are not available for patients in the "non-weight bear-

---

ties and procedures utilized in the treatment of patients:

\* \* \* \* \* \*

2. *Gait Training.* Gait evaluation and training furnished a patient whose ability to walk has been impaired by neurological, muscular, or skeletal abnormality requires the skills of a qualified physical therapist. However, if gait evaluation and training cannot reasonably be expected to improve significantly the patient's ability to walk, such services would not be considered reasonable and necessary. Repetitive exercises to improve gait or maintain strength and endurance and assistive walking, such as provided in support for feeble or unstable patients, are appropriately provided by supportive personnel, *e.g.,* aides or nursing personnel, and do not require the skills of a qualified physical therapist.

\* \* \* \* \* \*

4. *Range of Motion Tests.* Only the qualified physical therapist may perform range of motion tests and, therefore, such tests would constitute physical therapy.

5. *Therapeutic Exercises.* Therapeutic exercises which must be performed by or under the supervision of the qualified physical therapist ... due either to the type of exercise employed or to the condition of the patient would constitute physical therapy. Range of motion exercises require the skills of a qualified physical therapist only when they are part of the active treatment of a specific disease which has resulted in a loss or restriction of mobility (as evidenced by physical therapy notes showing the degree of motion lost and the degree to be restored) and such exercises, either because of their nature [or] the condition of the patient, may only be performed safely and effectively by or under the supervision of a qualified physical therapist. Generally, range of motion exercises which are not related to the restoration of a specific loss of function but rather are related to the maintenance of function (see B.2) do not require the skills of a qualified physical therapist.

ing" stage of rehabilitation and for amputees who have not yet received prostheses, because such patients do not require daily therapy and because Part B of Medicare may provide coverage for three days a week of therapy for patients who have purchased this optional health insurance. For one thing, the intermediaries' presumption that such patients never require skilled physical therapy on a daily basis is inconsistent with the uncontroverted testimony of the plaintiffs' medical experts. *See* Finding of Fact 6. For another, the defendant's argument that partial coverage of a given service under Part B of Medicare somehow forecloses full coverage of that service under Part A of Medicare appears to conflict with the regulatory requirement that, in determining whether skilled nursing or rehabilitation services can "as a practical matter" be provided only by an SNF, "the availability of Medicare payment for those services may not be a factor." 42 C.F.R. § 409.35(a).

In addition, the Secretary contends that any conflict between the plaintiffs' experts and the intermediaries with respect to the need of a given category of patient for daily skilled physical therapy is nothing more than a *"bona fide* professional difference of opinion." Defendant's Post-Trial Memorandum at 16 & n. 5. However, the only evidence offered by the defendant in support of this proposition, *see* Tr. 75–76, is limited to the question of whether coverage ought to be provided for range-of-motion exercises. The defendant has offered no evidence of any *"bona fide* professional difference of opinion" concerning non-weight-bearing therapy, maintenance therapy, therapy for amputees who are awaiting prostheses or therapy for patients who can ambulate 50 feet with supervision. Furthermore, even assuming for the argument that some professional difference of opinion exists with respect to range-of-motion exercises, the regulations expressly provide coverage for such exercises whenever they are "part of the active treatment of a specific disease state which has resulted in a loss of, or restriction of, mobility." 42 C.F.R. § 409.33(c)(4).

■ Finally, the defendant maintains that the intermediaries' denials of coverage cannot be characterized as arbitrary because employees of an intermediary sometimes are available to discuss individual coverage decisions with employees of an SNF. *See* Finding of Fact 16; Defendant's Post-Trial Memorandum at 16–17 & n. 5. However, in the absence of any evidence in the record that these discussions have caused intermediaries to alter their coverage decisions in more than isolated instances, *see id.,* the court cannot find that these occasional informal communications between SNFs and their intermediaries afford the plaintiffs the individualized determinations of their eligibility for skilled physical therapy to which they are entitled under the applicable regulations.

■ In order to determine whether the intermediaries' improper denial practices violate the Due Process Clause of the Fifth Amendment, the court must apply the balancing test enunciated by the Supreme Court in *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903. That test requires the court to consider three distinct factors:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See Kraemer, supra,* 737 F.2d at 221 (applying *Mathews v. Eldridge* balancing test in due process challenge to Secretary's "presumption of non-liability" procedure).

The private interest at stake in this action is highly significant. A denial of a Medicare claim for physical therapy benefits has important physiological, psychological and financial implications for the plaintiffs. *See* Findings of Fact 17–20. As the Court of Appeals held in *Kraemer,* which also involved the denial of Medicare benefits to SNF patients, the private interest in

such cases is particularly great because the costs of SNF care "can financially cripple all but the very wealthy" in a matter of weeks and "diminish[ ] the probability that a patient could choose to continue receiving medical care." 737 F.2d at 222.

The risk that the plaintiffs will erroneously be deprived of their Medicare benefits is great indeed, as is demonstrated by the high percentage of decisions denying physical therapy coverage that are reversed on appeal. *See* Findings of Fact 27–28. In addition, many other patients with potentially meritorious claims are physically or mentally incapable of pursuing an administrative appeal. *See* Finding of Fact 29. *See also David v. Heckler, supra,* 591 F.Supp. at 1044 (holding that even a 33 percent reversal rate established a "substantial" risk that plaintiffs would be erroneously deprived of Medicare Part B benefits and that "numerous erroneous determinations [denying benefits] are not appealed"). It is clear that additional safeguards will significantly reduce the risk that members of the plaintiff class will continue to be erroneously deprived of their benefits.

Finally, alternative procedural safeguards designed to ensure that Medicare coverage determinations are made on the basis of the individual patient's medical condition and therapeutic requirements, rather than on the basis of arbitrary and inflexible presumptions, *see* Section IIC, *infra,* will entail no greater "fiscal and administrative burdens" for the government than are contemplated by the applicable law and regulations. Furthermore, these safeguards, by ensuring that members of the plaintiff class receive the medically necessary physical therapy to which they may be entitled under Medicare, may actually reduce the "fiscal burdens" on the federal and state treasuries by enabling more elderly persons to live independently outside nursing homes. *See* Finding of Fact 17.

Accordingly, for the reasons stated above, the court concludes that the defendant's practices of determining eligibility for skilled physical therapy benefits under Part A of Medicare violate the Due Process Clause of the Fifth Amendment.[9]

### 2. *The Secretary's Procedures for Reviewing SNF Coverage Decisions*

The plaintiffs also contend that the Secretary's "presumption of non-liability," *see* Findings of Fact 23, 24, has caused the SNFs' initial determinations of Medicare coverage to be impermissibly biased against the granting of benefits. In support of this claim, the plaintiffs have offered testimony that some SNF personnel have tended in "questionable" situations to "err[ ] always on the side of denying, rather than allowing" coverage in order to preserve their "presumption of non-liability." *See* Finding of Fact 24.

The Secretary has since the conclusion of this trial promulgated regulations that terminated the "presumption of non-liability" effective March 24, 1986. *See* 51 Fed.Reg. 6222. Accordingly, the plaintiffs' challenge to the Secretary's "presumption of non-liability" procedure must be deemed moot.

It appears that the new regulations have not eliminated certain other practices that were criticized by the plaintiffs in connection with their challenge to the "presumption of non-liability." For example, the intermediaries presumably may continue to scrutinize SNFs' awards of coverage more thoroughly than SNFs' denials of coverage. *See* Findings of Fact 22, 23. However, the record contains insufficient evidence to persuade the court that the Secretary's current procedures for reviewing SNF coverage determinations operate in a manner

---

**9.** The plaintiffs, relying on *Jones v. Califano,* 576 F.2d 12 (2d Cir.1978), also raise an equal protection claim asserting that those elderly people who appeal their denials of Medicare coverage ultimately receive benefits while those who do not appeal are permanently deprived of coverage. Although the court need not reach this claim in light of its disposition of the plaintiffs' due process challenge to the defendant's coverage determination procedures, the court notes in passing that *Jones v. Califano* is clearly distinguishable both legally and factually from the case at bar.

that is impermissibly biased against the members of the plaintiff class.

Moreover, to the extent that the SNFs may have felt undue pressure in the past to deny arguably meritorious claims for physical therapy coverage, any such pressure is likely to be reduced substantially as a result of the remedy to be provided in this action. It is to this question that the court now turns.

## C. RELIEF

■ The issue of relief has not been extensively briefed by the parties to this action. However, the plaintiffs have suggested that the Secretary be required to adopt a presumption of Medicare coverage whenever the patient's treating physician prescribes a program of daily physical therapy; the Secretary could rebut this presumption, according to the plaintiffs, by offering substantial evidence (based on more than a "paper record") that the services prescribed by the physician are not covered by Medicare. The court finds that such a procedure is unsupported by any statutory or regulatory authority and is likely to saddle the government with "fiscal and administrative burdens" beyond those that would be appropriate under the balancing test of *Mathews v. Eldridge;* indeed, the effect of such a procedure could be to permit doctors to dispense Medicare benefits without the constraints of intermediary review.

Although the plaintiffs are not entitled to the remedy that they have requested, they are entitled to some relief. Accordingly, an order shall enter declaring unlawful the intermediaries' improper practices of denying claims for physical therapy benefits, enjoining the future use of such practices and instructing the Secretary properly to supervise determinations of physical therapy coverage made by his intermediaries. Members of the plaintiff class whose claims were denied based on practices of the intermediaries that have been found to be unsupported by applicable regulations, *see* Section IIB(1), *supra,* and who have not prevailed on appeal, are entitled to reconsideration of their claims. *See generally*

*City of New York, supra,* 742 F.2d at 739–740.

The parties shall confer and submit to the court, by no later than June 20, 1986, a proposed judgment effectuating this decision. The proposed judgment shall include a description of the procedure that is to be used by the Secretary in reconsidering the plaintiffs' claims for benefits.

## CONCLUSION

The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g). The plaintiffs are entitled to judgment with respect to their challenge to the intermediaries' improper practices of evaluating claims for physical therapy benefits under Part A of Medicare. The plaintiffs' challenge to the defendant's "presumption of non-liability" has been rendered moot by the defendant's termination of that procedure. By no later than June 20, 1986, the parties shall submit a proposed judgment consistent with this decision together with any appropriate orders and supporting memoranda.

It is so ordered.

## JUDGMENT

The court hereby enters the following judgment to effectuate the Memorandam of Decision and Order entered in this case on April 23, 1986.

### I. *Retroactive Relief To The Plaintiff Class*

A. The defendant will give written notice to all living members of the plaintiff class of their right to request that their claims for Medicare skilled nursing facility benefits be redetermined. The precise method of notification (including, but not limited to separate notice, or notice included as part of a periodic Medicare Part B notice) is left to the defendant's discretion, provided, however, that such notice be by first class mail and contain a response sheet and a stamped, self-addressed envelope to facilitate reply.

B. In addition to the personalized notice described above, the defendant will publish a generalized notice to the plaintiff class in

five newspapers or other publications having general distribution within the State of Connecticut, at least two of which must be publications whose target audience is the elderly.

C. The notice to plaintiffs described above shall inform plaintiffs that:

1. The United States District Court in *Fox v. Bowen*, Civil Action No. H 78–541 (JAC), has determined that the Secretary of Health and Human Services and his agents have acted illegally between October 1978 and April 1986 by arbitrarily denying Medicare skilled nursing facility benefits to patients receiving daily physical therapy treatments.

2. Any Connecticut resident who was denied Medicare skilled nursing facility benefits between October 1978 and the present, despite his or her receipt of daily physical therapy treatments, is a member of the plaintiff class, and is entitled to have his or her claim redetermined by the defendant.

3. Any member of the plaintiff class, or his or her representative, desiring such a redetermination should indicate that fact on the response sheet enclosed with the notice, and return the response sheet to the defendant in the self-addressed envelope enclosed.

D. The response sheet shall indicate the plaintiff's name and address, the name of the skilled nursing facility and the dates of skilled nursing facility care at issue.

E. In making the redetermination, the defendant will ensure that every plaintiff receives an individualized assessment of his or her entitlement to Medicare skilled nursing facility coverage in accordance with the Memorandum of Decision issued by the court on April 23, 1986. Specifically, the defendant will adhere to the following norms:

1. The defendant will not employ arbitrary presumptions or rules of thumb in order to deny coverage; such presumptions include the defendant's practice of denying skilled nursing facility coverage:

    a. to patients requiring maintenance therapy;

    b. for non-weight bearing therapy administered to fracture patients;

    c. for passive "range of motion" activities;

    d. for patients who can ambulate 50 feet with supervision;

    e. for amputees who have not been fitted with prostheses;

    f. for those patients who require daily skilled physical therapy for a period in excess of two weeks.

2. The certification and orders of the attending physician will be given due consideration. In any redetermination where the defendant denies Medicare skilled nursing facility coverage despite the attending physician's certification and order that daily physical therapy be given, the defendant shall describe with particularity why the care involved is not covered by the Medicare program.

F. Copies of all redetermination decisions shall be sent to plaintiffs' counsel, and to the special master described in Section II.C. below.

II. *Prospective Relief*

A. The defendant will provide written notice to all skilled nursing facility providers ("providers") of services and all intermediaries, informing them that:

1. The United States District Court in *Fox v. Bowen*, Civil Action No. H 78–541 (JAC), has determined that the Secretary of Health and Human Services and his agents have acted illegally between October 1978 and 1986 in arbitrarily denying Medicare skilled nursing facility benefits to patients receiving daily physical therapy treatments.

2. In making such determinations, providers and intermediaries shall henceforth ensure that every plaintiff receive an individualized assessment of his or her entitlement to Medicare skilled nursing facility coverage. Specifically, providers and intermediaries will adhere to the following norms:

    a. Providers and intermediaries will not employ arbitrary presumptions or rules of

thumb to deny coverage; such presumptions include providers' and intermediaries' practice of denying skilled nursing facility coverage:

1. to patients requiring maintenance therapy;

2. for non-weight bearing therapy administered to fracture patients;

3. for passive "range of motion" activities;

4. for patients who can ambulate 50 feet with supervision;

5. for amputees who have not been fitted with prostheses; and

6. for those patients who require daily skilled physical therapy for a period in excess of two weeks.

b. The certification and orders of the attending physician will be given due consideration. In any determination where the provider or intermediary denies Medicare skilled nursing facility coverage despite the attending physician's certification and order that daily physical therapy be given, the provider or intermediary shall describe with particularity why the care involved is not covered by the Medicare program.

3. Providers will supply the special master described below with copies of all coverage determination notices (either denial notices or claims for coverage) issued by providers for members of the plaintiff class. In addition, the providers will supply the special master in every case with an information sheet containing the patient's primary and secondary diagnoses, and indicating the frequency of physical therapy treatements ordered by the patient's attending physician.

B. The court shall appoint a special master to assist in administering and evaluating the relief provided by this Judgment. On or before the 15th day following the date of this Judgment, the parties shall submit, jointly or separately, the names and qualifications of individuals willing to undertake the duties of special master specified in this Judgment. After such nominations by the parties, the court shall issue an Order appointing a special master.

C. The special master shall have the following duties:

1. The special master shall conduct a seminar for all intermediary and provider personnel in Connecticut. At the seminar, the special master will explain the rulings of the court, including the requirement that all members of the plaintiff class receive an individualized assessment of their entitlement to skilled nursing facility benefits.

2. The special master will receive copies of all skilled nursing facility coverage determination notices (either denial notices or claims for coverage) issued by providers for members of the plaintiff class, together with the additional information set forth in Section II(A)(3) above.

3. The special master will choose a random sample of claim denials for further analysis, such method of selection and frequency thereof to be at the reasonable discretion of the special master. For purposes of such further analysis, the special master will obtain copies of the pertinent medical record and, at his or her discretion, may interview personnel of the provider, the plaintiff involved, and the attending physician, as appropriate, to determine whether plaintiffs are receiving the individualized determinations called for by this Judgment and other rulings of the court.

4. The special master will receive copies of all redetermination decisions, as set forth in Section I(F) above.

5. All documentary material collected by the special master will be made available for inspection by the parties.

6. After the special master has collected the information specified above for a period of six months, the special master will submit a formal written report to the court, with copies to counsel, detailing the special master's findings, which shall include the proportion of grants and denials of Medicare coverage for plaintiffs receiving daily physical therapy treatments (with respect to redeterminations in accordance with Section I and determinations with respect to Section II), and stating whether, in the special master's opinion, the plaintiff class as a whole is receiving individualized

**1254**

determinations as called for by the rulings of the court.

D. After receipt of the special master's written report, the court will schedule an evidentiary hearing at which the special master will be available for examination, if requested by either or both of the parties or by the court. After such hearing, the court may issue such further orders as are appropriate or necessary in the circumstances.

E. The special master shall be compensated for services at the rate of $40 per hour, such compensation to be included in recoverable costs under Fed.R.Civ.P. 54(d). In no event shall compensation exceed the amount of $5,000.

It is so ordered.